## Jodi L. Sweet v. Marcien Roy, Leon Roy, and the Marcien and Mary Anne Roy Trust

[801 A.2d 694]

No. 99-230

Present: **Dooley and Morse, JJ., and Toor, Supr. J., and Gibson, J. (Ret.), Specially Assigned**

Opinion Filed April 26, 2002

*Geoffrey F. Walsh* and *Gregg Meyer, Vermont Legal Aid, Inc.,* Springfield, for Plaintiff-Appellee.

*Christina A. Jensen* of *Lisman & Lisman, P.C.,* Burlington, for Defendants-Appellants.

**Dooley, J.** Defendants Marcien Roy, Leon Roy, and the Marcien and Mary Anne Roy Trust (the trust) appeal from a judgment entered in Bennington Superior Court on a jury verdict in favor of plaintiff Jodi Sweet. Defendants made several claims of error in a post-judgment motion for judgment as a matter of law or for a new trial, and renew those arguments here: (1) the trial court abused its discretion in admitting evidence of defendants' prior bad acts; (2) the court erred in ruling plaintiff was entitled to the protections of the Mobile Home Park Act, 10 V.S.A. §§ 6201-6266; (3) the trust was entitled to judgment as a matter of law; (4) the jury's damage award should have been set aside; (5) it was error to dismiss defendants' counterclaim for slander; and (6) the court erred in excluding evidence of a threat made against defendants by an alleged agent of plaintiff. We affirm.

The trial focused on events with respect to Jodi Sweet after she purchased a mobile home located in the Royal Pine Villa Mobile Home Court (the park), and with respect to others who owned homes in the park. The park had been owned and managed by Marcien and Mary Anne Roy for twenty years, but in 1993 ownership was transferred to the trust. The park was originally managed by Marcien, but by the time of this case management responsibilities had been assumed by Leon Roy, son of Marcien and Mary Anne. Paula Roy, wife of Leon, was responsible for running the park office, bookkeeping and answering the telephone. The Roys all lived on the park premises.

The park consists of sixty-six mobile home lots. Some of the mobile homes are owned by individual lessees who pay defendants a monthly lot rental; others are owned by defendants, in which case the rent is higher than it would be for the lot alone. For example, lot rent typically runs about $200-230 per month, whereas rent for a lot and mobile home is two to three times that amount.

Plaintiff purchased her mobile home, which was located on lot 35 in the park, from Justin Schwartz in February 1997 after several unsuccessful attempts to contact defendants in order to determine what she needed to do to obtain a lease. Plaintiff and her three-year-old daughter moved into the mobile home that month. She called defendants and left voice messages with them on a daily basis; she also sent them letters and mailed them lot rent checks for February and March 1997. The checks were not cashed, and defendants never responded to the calls and the letters. Plaintiff spent $3800 on improvements to the heating, flooring and wiring of the mobile home.

Soon after sending her third letter to defendants in March 1997, plaintiff returned home from work and discovered that someone had systematically smashed out all thirteen glass windows in her mobile home. One week later, plaintiff approached Marcien Roy in the park, and he told her he wanted her out of the park and offered her $500 for her mobile home. Shortly thereafter, plaintiff returned home from work to discover she had no electricity. She called an electrician, who determined that the underground electrical wires to her mobile home had been cut and covered between the home and the service meter. To restore service, plaintiff and several friends spent a day hand-digging a trench approximately two feet deep and sixty feet long so that new wires could be installed the next day. Leon Roy backfilled the trench with a backhoe before the wires could be run. Plaintiff had to redig the trench again by hand. By the time the new wiring was installed, she had been without power for about a week. Upon returning to the mobile home with her daughter after power was restored, she "felt terrified" and "under a lot of stress."

Defendants Marcien and Leon Roy denied responsibility for the vandalism to plaintiff's mobile home, although Leon did admit to filling in plaintiff's hand-dug ditch because "it was a dangerous thing." Marcien, Leon, and Paula testified that plaintiff was a trespasser and had no rights as a resident because she and the party she bought the mobile home from had not followed the required procedures.

Virtually all of the rest of plaintiff's evidence dealt with other mobile home owners who resided at one time in the park. The most important of this evidence involved an earlier similar suit brought in 1986 by Mark Wright and the State of Vermont against Marcien and Mary Anne Roy. In that suit plaintiffs alleged defendants had instituted an illegal policy requiring that any tenant who wished to sell a home in the park sell to defendants and prohibiting any sale to others unless the home was removed from the park. Plaintiffs also alleged that defendants had vandalized plaintiff Wright and his mobile home when he tried to sell it to a third party.

The court found that the plaintiff's allegations were true and that the Roys had initiated the plan to acquire homes in the park because they could charge substantially higher rents for a lot and mobile home than they could for a lot alone, and would realize larger profits from their park, especially if they were able to drive down the capital expenses associated with this enterprise — namely, the purchase price of the mobile homes. The court found that in June 1986 the Roys sent the park residents a notice declaring their policy to require all mobile

homes to be moved out of the park upon resale. The Roys also required each resident who sold a mobile home to pay the Roys a $200 brokerage fee whether or not the Roys assisted in the sale of the mobile home. The court found that the Roys would refuse to accept willing purchasers when a park resident sought to sell a mobile home to a third party.

The court found that the Roys used illegal self-help eviction measures against Mr. Wright. Specifically, the court found that in May 1986 Mr. Wright wanted to sell his mobile home and move in with his parents in order to regain a solid financial footing. Wright had a willing purchaser who offered $12,000, but the Roys refused to approve the sale and said no prospective purchasers would be approved. In September of that year, Wright told the Roys he would withhold his lot rent until allowed to sell his mobile home. Later that fall, Wright took a roommate to share expenses. In December, the roommate moved out after the tires on his and Wright's cars were slashed and the cars were spray painted. The television cable was cut, and snow was plowed into the driveway, blocking in the cars. The court found by a preponderance of the evidence that these acts were performed by Leon Roy.

The court found that defendants had violated the Vermont Mobile Home Park Act, 10 V.S.A. §§ 6201-6266 (the Act) in four respects. Specifically, it found illegal the policy of requiring tenants who wished to leave the park to remove the mobile home or sell it to defendants. It found illegal the rejection of prospective purchasers "for reasons that theretofore had not been prohibitions in the terms of the lease." The court also found two violations of the Vermont Consumer Fraud Act, 9 V.S.A. §§ 2451-2480g. Specifically, it found that defendants violated the act in "the strong-arm tactics used in an apparent attempt to persuade Mr. Wright to abandon his tenancy in the park."

As part of its relief, the court enjoined the Roys from "unreasonably refusing entrance [to the park] to purchasers or prospective purchasers" and from refusing entry to any purchaser who "qualif[ies] under uniformly enforced, written, reasonable terms of the park lease." The court also awarded damages and attorney's fees for the State and Mr. Wright.

At the time of the *Wright* suit, the park contained sixty-six lots of which sixty-five contained a mobile home. Residents of the park owned fifty-seven of these mobile homes, and the Roys owned just eight. By the time of this trial in January 1999, and despite the judgment in the *Wright* case, the Roys owned approximately thirty of sixty-three

mobile homes in the park. From 1993 until 1997, no homes were sold to new park residents.

Most of the rest of plaintiff's evidence involved incidents close in time to the events involving plaintiff. Ken Scott testified that he purchased the mobile home on the lot next to plaintiff's, lot 34, in February 1997. He used his $5000 savings to buy the mobile home. Prior to doing so, he had his real estate agent send defendants a certified letter asking to be qualified as a park resident. Defendants orally refused without stating any reason and told Scott the park did not have a standard written lease. Scott moved in and began sending rent payments to defendants. He was later confronted by Leon Roy, who advised him that he would not be able to stay in the park. Soon after this encounter, someone removed the drain plug from Scott's kerosene tank causing a fuel spill and a costly clean up by a state environmental team. Someone also threw rocks through his windows and cut off his power. Scott eventually left the park due to the vandalism and associated stress. Although he was offered $7000 for his mobile home, he could not sell it because Leon Roy refused all purchasers. A realtor used by Scott testified that she had sent defendants a certified letter on behalf of two prospective purchasers of the Scott mobile home, but that she had received no response from defendants with respect to either.

Tracey Schwartz and Justin Schwartz testified that the mobile home involved in the instant appeal, located on lot 35, was sold to plaintiff by Justin Schwartz in February 1997. He purchased the mobile home from his aunt, Tracey Schwartz in 1996; Tracey Schwartz had lived in the mobile home on lot 35 from 1982 to 1996. She tried to sell the mobile home once before. She testified that her attorney had sent defendants a letter and received no response. Later, defendants declined her prospective purchaser without a reason: they merely stated that the purchaser was declined and that "they knew the reason." Tracey eventually sold the mobile home to Justin without notifying defendants.

Before moving into the mobile home, Justin Schwartz repeatedly attempted to call defendants to obtain a lease. In December of 1996, someone threw a rock through his front door. Schwartz also testified that he had arranged to have cable service installed at the mobile home. When the company failed to come, he called them, and they told him that defendants had said not to install the cable because Schwartz was not going to be there long. In late December or early January, Schwartz noticed that there was a bullet hole in his kerosene tank that

caused the fuel to leak out onto the ground. After this was repaired, someone poured water into his fuel tank, and the fuel lines froze. Finally, Schwartz decided to sell the mobile home and move out. He repeatedly tried to contact defendants in an effort to follow whatever procedures were required to sell the mobile home, but defendants never responded.

Joe Candal testified that he had been a park resident for seven and a half years, residing on lot 29. He eventually decided to sell his mobile home, and sent registered letters to defendants to notify them on each occasion that he had a prospective purchaser. He had an offer of $11,000 cash from a woman from Massachusetts who had money from a divorce settlement and was looking to buy a home in Vermont. She, along with several other prospective purchasers, was refused by defendants, and eventually he had to sell the mobile home for only $4000.

Dolores Goodell testified that she had been a park resident for twenty-two years, and that when she approached an area realtor to sell her mobile home, the realtor laughed at her when she revealed where it was. She decided to sell the home herself, and she and her daughter put out a sign and listed the home in a circular. When she first moved into the park, she had a lease, but it ran out and was not renewed. When she put her mobile home up for sale in January 1998, she tried to get a copy of the lease from defendants, but they never sent her one until she called the Attorney General's Office. After receiving the lease, Goodell sent defendants several certified letters over the next few months to notify them of prospective purchasers. She testified that in each case she had to wait thirty days for a response, and each applicant was denied. This happened four times, until, in mid June, defendants finally accepted one of the prospective purchasers. Originally, she was asking $5000 for her mobile home, and she had purchasers willing to pay that amount, but she ended up selling it for $2000.

In April 1997, plaintiff filed this action in Bennington Superior Court for damages and injunctive relief. Plaintiff alleged that defendants broke her windows, cut her electric line and refilled her trench in an effort to illegally evict her, and she sought relief under the Vermont Mobile Home Park Act and on theories of equitable estoppel and intentional infliction of emotional distress. On April 23, 1997, based on the consent of the parties, the court issued a temporary order prohibiting defendants from engaging in any further self-help eviction

measures pending resolution of the suit, and no further acts of vandalism occurred.

The parties skirmished over the admissibility of the facts and order in the *Wright* case and the testimony of other mobile home owners as described above. As discussed in detail below, the court denied defendants' motion to exclude the evidence, finding it admissible to identify defendants as those responsible for the acts of vandalism and to show a continuing plan and motive behind their conduct.

Defendants argued that plaintiff was not protected by the Act because she had never been accepted as a tenant. The court rejected this argument, ruling that plaintiff was a resident of the park and was entitled to the protections of the Act as a matter of law, and instructed the jury accordingly. The court dismissed defendants' counterclaims for foreclosure of lien, ejectment, and trespass, dismissed plaintiff's claims based on equitable estoppel and intentional infliction of emotional distress, and dismissed plaintiff's claim for injunctive relief as unripe. The case was then submitted to the jury on special interrogatories, and the jury returned a verdict for plaintiff. The jury found that Leon Roy did attempt "to evict plaintiff by force or other self-help means," but found that Marcien Roy was not liable for the same conduct. In addition, the jury found that Leon Roy "wilfully caused, directly or indirectly, the interruption or termination" of plaintiff's utility service, but found that Marcien Roy did not do the same. The jury awarded plaintiff $10,000 compensatory damages against Leon and the trust. It also found that both Marcien and Leon Roy "acted recklessly and in wanton disregard of plaintiff's rights" and awarded $100,000 punitive damages against Leon, Marcien, and the trust. The jury was precluded from considering defendants' counterclaim for slander because it found for plaintiff on the illegal eviction claim.

After judgment on the verdict was entered, defendants moved for judgment as a matter of law or for a new trial pursuant to V.R.C.P. 50(b) and 59. Defendants argued that the jury's verdict finding Marcien acted recklessly and in wanton disregard of plaintiff's rights was at odds with its finding that Marcien did not "directly or indirectly" cause the interruption of utilities or otherwise use force or other self-help means to evict plaintiff. The court agreed with defendants on this issue and set aside the verdict against Marcien Roy for punitive damages.

Defendants also argued in their motion that the trust was entitled to judgment as a matter of law. The court denied this part of defendants'

motion, ruling that as a matter of law Leon Roy was acting in the scope of his employment and for the benefit of the trust when he carried out the illegal eviction acts because "the only reasonable inference" from the evidence was that Leon Roy's actions were "related solely to his position as a mobile home park manager and the employee/beneficiary of the trust. His self-help eviction efforts directed at plaintiff could only have been motivated by the overall financial goals of the family and the family trust." The court then upheld the punitive damage award against the trust, again ruled that plaintiff was a resident of the park and entitled to the Act's protections, declined to order a new trial due to the prior bad acts testimony, and upheld the jury awards as "plainly within the jury's discretion, and not clearly excessive." The court also ruled that defendants were not entitled to a new trial because the court had excluded threats against defendants made by plaintiff's ex-boyfriend, and that defendants' slander claim failed because the jury verdict demonstrated that the statements alleged to have been made by plaintiff were true.

## I.

On appeal, defendants reassert the same arguments made in their post-trial motion. We begin with the claims that one or more defendants should have prevailed as a matter of law. There are two such claims: (1) as a matter of law, plaintiff was not entitled to the protections of the Mobile Home Park Act; and (2) the Marcien and Mary Anne Roy Trust is not liable because plaintiff failed to state a claim against it.

## A.

The first argument relates to plaintiff's complaint count that defendants violated the Act because they did not provide adequate and reliable utility services to her as required by 10 V.S.A. § 6262, the only count that went to the jury. After discussion among the parties and the court, this count was charged as an allegation that defendants attempted to evict plaintiff "by force or . . . other self-help measure." *Id.* § 6237(a)(1). The provision prohibits such conduct by a park owner against a "mobile home resident." *Id.* § 6237(a); see also *id.* § 6237(d) (limiting applicability of § 6237 to mobile home park owners).

Defendants argue that plaintiff was not entitled to the protection of the prohibition on self-help eviction because she was not a resident. She was not a resident, they argue, because the prior owner failed to comply with § 6240(a) and provide defendants with the name of

plaintiff as the prospective purchaser before the sale occurred so they could determine whether to accept her as a tenant.

■The Act defines the term "mobile home park resident" as "an individual ... who occupies a mobile home on a permanent or temporary basis in a mobile home park." *Id.* § 6201(6). We can find no support for defendants' position in this definition. The definition turns on the fact of occupancy rather than its legality. Even if plaintiff were unlawfully occupying her mobile home and lot, an issue that was hotly disputed between the parties, there is nothing in the words of the definition to suggest that she did not have the protection of the Act. Indeed, the broad coverage of temporary and permanent occupancies suggests that the occupant need not have a particular status to be a resident for purposes of the Act. Normally, we must apply a statute in accordance with the plain meaning of its language. See *McMurphy v. State*, 171 Vt. 9, 12, 757 A.2d 1043, 1046 (2000).

■As plaintiff argues, the Legislature had a model to accomplish exactly and explicitly what defendants attempt to infer from the language of the Act. The Legislature defined a "tenant" under the Residential Rental Agreements Act, 9 V.S.A. §§ 4451-4469, as "a person entitled under a rental agreement to occupy a residential dwelling unit," *id.* § 4451(9), and then worded the comparable provisions prohibiting self-help evictions as flowing to the "tenant." *Id.* § 4463(a). Other states have defined mobile home park "resident" similar to the Vermont definition of "tenant," specifically providing that the resident must be present under a rental agreement. See N.M. Stat. Ann. § 47-10-2(H) (1978) (1995 Repl.) (resident is a person present "under a rental agreement"); 68 Pa. Cons. Stat. Ann. § 398.2 (1994) (resident is a person who "leases or rents space" in a mobile home park). The comparison of the Vermont language with these alternatives reinforces the inference that the Legislature did not require that a mobile home park resident have a lease with the park owner in order to be protected by the Act.

■Finally, under the circumstances of this case, the policy considerations favor plaintiff's position. Defendants argue that the Legislature intended that persons in plaintiff's position have no rights so it is permissible for the park owner to cut off heat and power without warning, or break every window in the home, as a means to evict the tenant. This extreme position ignores the state's interest in the peaceful resolution of legal disputes without force or violence. We conclude that one of the purposes of a broad definition of "resident"

was to ensure that disputes between mobile home park owners and occupants of homes would not be resolved by the methods defendants employed here.

### B.

The second argument relates to the trust. The trust argues that it can not be held liable because plaintiff failed to cover the trust in its complaint.

Plaintiff's complaint and amended complaint named as defendants Marcien, Mary Anne and Leon Roy. Defendants answered and raised counterclaims by Marcien Roy, acting as trustee on behalf of the trust. This was apparently the first notice that the park was owned by the trust, rather than by Marcien and Mary Anne Roy. Plaintiff responded by making a motion to amend the complaint to add the trust as a defendant. She attached to the motion, as the proposed amended complaint, a new first page which changed the caption to add the trust as a defendant and changed paragraph three in the complaint to state "Defendants Marcien Roy and Mary Anne Roy are trustees of the Marcien and Mary Anne Roy Trust, which owns the Royal Pine Villa Mobile Home Park." Apparently, she requested the single page amendment because the prayers for relief were generally stated as against "defendants" without differentiating among them. The court allowed the amendment by an order dated April 6, 1998. Plaintiff filed no further document in response to that order.

On the first day of trial, January 25, 1999, defendants asked the court to dismiss the trust as a party defendant on the ground that no separate amended complaint had been filed once the court granted plaintiff leave to amend. The trial court refused to do so. On appeal, defendants argue that a motion is not itself a pleading, that once a motion to amend a complaint is granted an entire new amended complaint must be filed, and that because plaintiff did not do so the court erred in refusing to dismiss the trust as a defendant.

The exact nature of the trust's claim of error is unclear. It has not claimed that there was no jurisdiction over it because no process was served on it pursuant to V.R.C.P. 4, apparently because it recognizes that prior to the amendment it had asserted counterclaims against plaintiff without formally entering the case as a party. Instead, it argues that a motion to amend must be followed by an amended complaint, but acknowledges such a filing may be unnecessary if the moving party attaches the proposed amendment to the complaint to the motion. Thus, its claim of error apparently reduces to an assertion

that plaintiff had to attach all pages of the complaint to her motion, or had to serve separately the entire complaint, even though none of the unattached and unserved pages were amended. While we agree that the court could have insisted that plaintiff file and serve a full amended complaint, or given the trust more time to answer, see *Carter v. Church*, 791 F. Supp. 297, 298 (M.D. Ga. 1992), the trust seeks reversal of the judgment based on a technical rule that elevates form over substance. See *North Georgia Elec. Membership Corp. v. City of Calhoun*, 989 F.2d 429, 432 (11th Cir. 1993). Such a rule would be inconsistent with our policy that amendments to the pleadings are to be freely given where there is no prejudice to the opposing party. See *Desrochers v. Perrault*, 148 Vt. 491, 493, 535 A.2d 334, 336 (1987); Reporter's Notes to V.R.C.P. 15. We reject the trust's claim.

## II.

We turn now to three arguments, which if accepted, would require a new trial on plaintiff's claim or on one of the counterclaims: (1) the court erred in ruling that, as a matter of law, the trust was responsible for the conduct of Leon Roy; (2) the court erred in admitting evidence of prior bad acts; and (3) the court erred in excluding evidence of threats made to the Roys by plaintiff's agent.

## A.

The first ruling occurred following the close of evidence in response to defendants' argument that the jury would have to find agency and vicarious responsibility to hold the trust liable for the acts of either Leon or Marcien Roy. The court ruled that agency was present as a matter of law. Defendants further preserved their position by an objection following the charge to the jury.

The nucleus of defendants' argument is that plaintiff had to prove that Leon Roy's acts were taken within the scope of his employment, *Poplaski v. Lamphere*, 152 Vt. 251, 257, 565 A.2d 1326, 1330 (1989), and that question should have been put to the jury. Defendants particularly rely upon our recent explanation of this element in *Brueckner v. Norwich University*, 169 Vt. 118, 123, 730 A.2d 1086, 1091 (1999):

> To be within the scope of employment, conduct must be of the same general nature as, or incidental to, the authorized conduct. See Restatement (Second) of Agency § 229(1) (1958). Conduct of the servant falls within the scope of employment if: (a) it is of the kind the servant is employed to perform; (b)

it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master; and (d) in a case in which the force is intentionally used by the servant against another, it is not unexpectable by the master. See *id.* § 228(1). Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time and space limits, or too little actuated by a purpose to serve the master. See *id.* § 228(2).

Defendants argue that at least as to two of the elements — whether the conduct of Leon Roy was "the kind" he was employed to perform, and whether the conduct was "unexpectable" by the master — were disputed.

The court granted judgment to plaintiff as a matter of law on the issue of the trust's vicarious responsibility for the acts of Leon Roy. In reaching this conclusion, it was required to find that "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." V.R.C.P. 50(a)(1). The court relied upon the undisputed evidence of Leon Roy's authority and past conduct. According to his testimony, Leon Roy was the manager of the park responsible for all phases of its policy and management. He made all decisions about how the park ran. He was responsible for all decisions on applications to rent a lot in the park. The only other employee was his wife, Paula Roy, who did the bookkeeping and office work. Marcien Roy was retired but did "a little work around the park for Leon."

The court found that there was no evidence that Leon Roy's actions were motivated by personal animus to plaintiff and concluded:

> Here, the only reasonable inference from the evidence admitted and the jury's special findings is that Leon Roy's actions were related solely to his position as a mobile home park manager and the employee/beneficiary of the Trust. His self-help eviction efforts directed at plaintiff could only have been motivated by the overall financial goals of the family and the family trust.

We agree with the superior court's analysis.

While there are some factual disputes in this case, there are none bearing on the scope of Leon Roy's authority. In general, we follow the modern view, "that is, the inquiry turns not on whether the act done was authorized or was in violation of the employer's policies, but rather whether the acts can properly be seen as intending to advance the

employer's interests." *McHugh v. Univ. of Vt.*, 758 F. Supp. 945, 951 (D. Vt. 1991), *aff'd*, 966 F.2d 67 (2d Cir. 1992). Thus, there is no requirement that the master specifically authorize the precise action the servant took. See *Pelletier v. Bilbiles*, 227 A.2d 251, 253 (Conn. 1967) (responsibility of store employee to ensure customers did not misbehave in the store made store owner vicariously liable when employee beat a customer to stop him from misbehaving; "fact that the specific method a servant employs to accomplish his master's orders is not authorized does not relieve the master from liability"). Such a requirement would mean that there could rarely be vicarious liability for intentional torts because the master would not specifically authorize the commission of an intentional tort. The law is to the contrary. See Restatement (Second) of Agency §§ 230, 231 (1958); see also *Tarman v. Southard*, 205 F.2d 705, 706 (D.C. Cir. 1953) (jury could find taxicab company vicariously liable where taxi driver drove his cab over plaintiff's leg as a result of a dispute over the fare); *Sayers v. Boyles*, 190 So. 2d 707, 709 (Ala. 1966) (landlord could be found responsible for action of rent-collection agent who assaulted tenant when he did not pay on time); *Hechinger Co. v. Johnson*, 761 A.2d 15, 25 (D.C. 2000) (where supervisory staff person of store assaulted plaintiff-customer in the course of a discussion over scraps of wood given to plaintiff by other customers, store could be held vicariously liable); *Gonpere Corp. v. Rebull*, 440 So. 2d 1307, 1308 (Fla. Dist. Ct. App. 1983) (jury could find apartment owner vicariously liable where apartment manager shot tenant during discussion of tenant's eviction notice); *Hinson v. Morris*, 298 S.W. 254, 256 (Mo. Ct. App. 1927) (apartment owner held vicariously liable where apartment manager assaulted plaintiff when he could not pay for damage to personal property in his apartment); *De Wald v. Seidenberg*, 79 N.E.2d 430, 432 (N.Y. 1948) (apartment building owner could be held liable where superintendent pushed tenant down a flight of stairs in argument over breach of building rules by tenant's maid).

In this case, the trust has consistently taken the position that plaintiff was a trespasser, and, therefore, it could use self-help means to evict her. There is no dispute that Leon Roy's responsibility as park manager included the removal of trespassers from the park. See *Ploof v. Putnam*, 83 Vt. 252, 257, 75 A. 277, 278 (1910) (island caretaker who was responsible to keep trespassers off the island could use such force as is necessary to accomplish the purpose). The trustees were on notice that Leon used surreptitious vandalism and utility disconnection as a means of self-help eviction. They were parties to the 1986 action in

which the court found Leon used these methods to evict Mark Wright and awarded $10,234 in compensatory and punitive damages against them. Yet, they made no change in their methods of operation after that judgment. Finally, there is no evidence that Leon acted out of personal animus against plaintiff, rather than for the business interests of the park. See *id.* (island owner is liable if caretaker would not allow boat to land in a storm as long as caretaker did not act for his own private purpose). It was undisputed that Leon Roy had never met, and had never communicated with, plaintiff until the trial of this case.

■ Where it is "clearly indicated" that the servant was acting within the scope of the employment, the court may hold the master vicariously responsible as a matter of law. Restatement (Second) of Agency § 228 cmt. d; see also *Ploof,* 83 Vt. at 259, 75 A. at 279 (although scope of employment is normally a question of fact, it can be decided as a matter of law where "facts and the inferences to be drawn therefrom are not in dispute"). It is hard to imagine a case where authorization is more clearly indicated. The superior court properly found as a matter of law that Leon's actions were taken to benefit the park and the trust, as its owner; the self-help methods Leon employed were of the kind he was employed to perform; and Leon's intentional force was "not unexpectable by the master." There is no error in holding the trust vicariously responsible for Leon's acts.

## B.

Defendants' second ground for its motion for a new trial was the admission of the opinion and judgment in *Wright v. Roy,* the testimony of the circumstances of that case, and the testimony of other mobile home owners describing events involving their sale, purchase or occupancy. Defendants filed a motion in limine seeking to exclude this evidence on the ground that it was inadmissible under V.R.E. 403 and 404. Plaintiff argued in response that the evidence was not inadmissible under Rule 404, because it was not offered to prove defendants' character, but rather to show motive, plan and the identity of the person who vandalized her mobile home. She argued that the evidence was not inadmissible under Rule 403 because the probative value was high, and it outweighed any prejudice to defendants.

The court denied the motion in limine, essentially for the reasons argued by plaintiff. Defendants renewed their objection to this evidence prior to trial and were granted a continuing objection to evidence of this sort by the trial court. They also renewed their arguments in their post-verdict motion for a new trial. The court

rejected this ground for the motion, holding that the evidence was admissible "to identify defendants as the perpetrators of the acts against plaintiff and to show a continuing plan and motive behind defendants' conduct towards plaintiff."

Defendants renew their claim that the admission of the evidence violated V.R.E. 404(b).* They argue that this evidence was not (1) probative of identity because the acts are not so distinct as to be signature-like; (2) that the evidence was not probative to show motive because there is no connection between the conduct in the case at bar and the prior conduct; and (3) that the evidence is not probative of a continuing plan because the prior acts are too remote in time and too dissimilar. Defendants argue that because admission of the evidence was not justifiable under these exceptions to Rule 404's general prohibition against character evidence, the only reason the evidence was offered and admitted was to show the defendants' bad character and to prove they acted in conformity therewith, in violation of the rule. Finally, they argue that even if the evidence was admissible under Rule 404(b), it failed as a matter of law to pass the balancing test imposed by V.R.E. 403.

Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

We begin by emphasizing that trial courts have wide discretion in ruling on the admissibility of evidence. *Derosia v. Liberty Mut. Ins. Co.*, 155 Vt. 178, 189, 583 A.2d 881, 887 (1990). Evidentiary rulings which lie in the discretion of the trial court will not be reversed absent a showing that the court abused its discretion by either totally withholding that discretion or by exercising it in a clearly untenable or unreasonable fashion. *State v. Parker*, 149 Vt. 393, 401, 545 A.2d 512, 517 (1988).

Plaintiff's primary ground for admission of the disputed evidence was to show a plan, a permissible ground specifically authorized by

---

* Defendants have treated the evidence as prior bad act evidence, inadmissible under V.R.E. 404(b), despite the fact some of it related to events subsequent to the vandalism of plaintiff's mobile home. In view of defendants' position, we have likewise assumed that all the evidence is governed by Rule 404(b).

Rule 404(b). We have decided a number of Rule 404(b) plan cases, the first and most detailed of which is *State v. Catsam*, 148 Vt. 366, 534 A.2d 184 (1987), a child sexual assault criminal case. In *Catsam*, we affirmed the admission of evidence of defendant's prior sexual assaults on the victim, which occurred on six occasions over the two years prior to the charged incident. Our holding was:

> Evidence that the defendant previously molested the victim, and threatened her with harm if she were to reveal the incident, gives rise to the legitimate inference that because of the manner in which the prior sexual acts were perpetrated, the prior acts and the charged crime were part of a concerted scheme or plan of molestation.

*Id.* at 381, 534 A.2d at 194. In announcing this holding, we acknowledged that "admitting evidence of prior sexual acts to prove a plan comes perilously close to the prohibited practice of admitting evidence of the defendant's character to prove he acted in conformity therewith in committing the crime charged." *Id.* Thus we emphasized,

> [i]n order to ensure the principled application of the rule, trial courts must find, at a minimum, a clear inference of the existence of a plan from the prior acts. At least two factors are crucial considerations in making this determination: similarity between the prior acts and the crime charged and proximity in time. . . . Other factors may also be considered, but the controlling consideration is whether the evidence tends to establish a scheme or plan of sexual molestation.

*Id.* at 382, 534 A.2d at 194. Other cases have reiterated the crucial considerations of similarity and proximity in time. See *State v. LaBounty*, 168 Vt. 129, 134, 716 A.2d 1, 5 (1998); *State v. Winter*, 162 Vt. 388, 396-98, 648 A.2d 624, 629 (1994); *State v. Hurley*, 150 Vt. 165, 169, 552 A.2d 382, 385 (1988). We explained in *Winter*, however, that there are no "hard-and-fast time limits" and that the "precise amount of elapsed time is less important than the relation between the passage of time and the inference that there is an overall plan to the defendant's actions." 162 Vt. at 397, 648 A.2d at 629. Thus, we noted that in child sexual assault cases we would authorize the admission of "much earlier assaults on the victim when the evidence also shows such assaults have continued right up to the charged event." *Id.*

Defendants argue that the evidence of the events and outcome in the *Wright* case are inadmissible to show a plan because they occurred

over a decade before the events that gave rise to this litigation and are not similar to those events. For two reasons, we disagree.

First, we believe the evidence met the *Catsam* and *Winter* standards such that its admission fell well within the discretion of the trial court. Plaintiff alleged that defendants had a plan to gain ownership of all mobile homes in the park even by unlawful methods. The court's 1987 conclusions and order in the *Wright* case found the plan that plaintiff alleged existed. Specifically, it found that defendants' policy of requiring owners to sell only to defendants was illegal, that defendants' refusal to approve sales of mobile homes to third parties based on reasons not provided in the park leases was illegal, and that defendants used illegal "strong-arm tactics" to persuade Mr. Wright to abandon his tenancy in the park. On the basis of these conclusions, the court issued injunctions against the first two practices and awarded damages for the third. Significantly, the injunctions were issued in favor of the State of Vermont, a plaintiff in the *Wright* case, so they applied to any prospective purchaser, including plaintiff in this case.

If plaintiff failed to show that anything occurred in pursuit of the plan between 1987 and 1997, defendants might have been in a position to complain about the lack of proximity in time. In fact, plaintiff showed that despite the injunction, the percentage of mobile homes in the park owned by defendants rose greatly from 13% in 1987 to 48% in 1999. She also showed that no home was sold to a new park resident between 1993 and 1997.

Finally, there was testimony that the plan, created in 1986, continued right up to the present. One of plaintiff's witnesses, Joe Candal, testified that he tried to sell his home for a year, proposing many purchasers to defendants, but they declined all of them. In frustration, Mr. Candal offered to sell the home to Leon Roy, who said he might have been interested a few months ago, but could not purchase it at that time because "[t]he state's watching us pretty good."

As we said in *Winter*, the important consideration is the relation between the passage of time and the inference that there is "an overall plan to the defendant's actions." *Id.* The inference was strong that defendants' plan to gain ownership of all the mobile homes in their park continued from 1986 right up to the present.

We have a similar reaction to defendants' claim that the prior bad acts were not sufficiently similar to the conduct involving plaintiff. On this point, defendants are apparently challenging not only the *Wright*

case evidence but also the evidence of events involving other tenants which occurred around the time of the vandalism of plaintiff's home. Defendants argue that none of these events are sufficiently similar because only plaintiff claimed that her windows were broken and her electric wire cut.

The record does not support defendants' argument. Mr. Scott testified that his windows were broken and his electric power was disconnected. In any event, defendants are quibbling over minor differences and ignoring the essential similarity in the experiences of the tenants and those who bought mobile homes in the park. As the court concluded in the *Wright* decision, defendants engaged in "strong-arm tactics" to prevent an owner from selling to a purchaser other than defendants. Whether those strong-arm tactics involved vandalizing vehicles, cutting cable TV lines, cutting power lines, disconnecting power lines, removing a kerosene tank's drain plug, shooting a hole in a kerosene tank, throwing rocks through windows or throwing a rock through a front door is insignificant. They are all anonymous acts of vandalism intended to interfere with the use and enjoyment of the mobile home premises and usually to scare and intimidate the mobile home occupant. In most cases, they were accompanied by a refusal to approve prospective purchasers and/or a refusal to recognize, or even respond to, a purchaser without a prior authorization. The similarities overwhelm any differences.

There is a second, more general, reason why the evidence was admissible under the plan exception in this case. All of our Rule 404(b) plan cases have involved an "unlinked plan," that is, a series of proximate, similar crimes which establish a plan to commit the series of crimes. See E. Imwinkelried, *Using a Contextual Construction to Resolve the Dispute over the Meaning of the Term "Plan" in Federal Rule of Evidence 404(b)*, 43 U. Kan. L. Rev. 1005, 1011 (1995). This, however, is a "linked acts" plan, also called a true plan, where plaintiff has shown a grand design to gain ownership of the mobile homes in the park and each act of misconduct "is a means to the end of achieving the overarching end or objective." *Id.* at 1015; see also 1 J. Strong, McCormick on Evidence § 190, at 661 (5th ed. 1999) (under plan exception "crime should be an integral part of an overarching plan explicitly conceived and executed by the defendant"). In true plan cases, an "act can be probative of a true plan even when it is dissimilar to the charged" acts and "the uncharged and charged ... [acts] need not be proximate in time." 1 E. Imwinkelried, Uncharged Misconduct Evidence § 3.22, at 118 (rev. ed. 1999). Thus, while we believe that the

trial court could consider similarity and proximity in determining the admissibility of the evidence, there are no hard and fast lines as defendants suggest.

The evidence was also admissible to show identity, a critical issue in this case where plaintiff had no direct evidence that Leon Roy committed the acts of vandalism. Particularly relevant to plaintiff's case was the evidence from the *Wright* case that the acts of vandalism were anonymous, but the court found by a preponderance of the evidence that Leon Roy committed those acts. Also relevant was the fact that unapproved occupants of homes suffered acts of vandalism, suggesting that the vandalism was being used as a method of eviction. Indeed, that was exactly the court's conclusion in the *Wright* case.

Defendants argue, however, that in order to use prior bad act evidence to prove identity, the acts must be so distinctive as to amount to a signature. Here, they argue, the acts of vandalism perpetrated on plaintiff were unique, and none of the witnesses were trying to force defendants to give him or her a lease. Thus, they argue the evidence was inadmissible to prove identity.

Defendants' argument is based on *State v. Bruyette*, 158 Vt. 21, 604 A.2d 1270 (1992), a sexual assault case in which the victim was unable to identify the perpetrator because she was blindfolded. The court admitted the testimony of the defendant's former girlfriend to describe certain sexual practices he liked to engage in, certain statements he frequently made during sex, and how he liked to use cocaine during sex. The practices and statements were similar to those that occurred with the victim, and the perpetrator had used cocaine during the sexual assault.

We upheld the admission of the evidence, noting that the pattern and characteristics of the prior act "must be so distinctive, in effect, to constitute the defendant's signature," *id.* at 27, 604 A.2d at 1273, and further described the standard as follows:

> Although the prior acts of the accused and the charged acts do not have to be identical, they must possess common features that make it highly likely that the unknown perpetrator and the accused are the same person. Whereas a few common features that are unique may be sufficient, a larger number of them, less remarkable, but taken together, may also have significant probative value.

*Id.* at 28, 604 A.2d at 1273. For two reasons, evidence of the other acts in this case did not run afoul of the *Bruyette* standard.

First, as described above, plaintiff showed an overall plan that allowed admission of much of the evidence. The existence of the plan, and the prior finding that Leon Roy vandalized the home of Mark Wright, was relevant to show that Leon Roy was responsible for vandalizing plaintiff's mobile home. See J. Strong, *supra*, § 190, at 661 (plan is relevant to show "the doing of the ... act, the identity of the actor, or his intention"). Plaintiff did not have to meet the strict standard of *Bruyette* to admit prior bad act evidence to show identity in this case.

Second, we conclude that plaintiff did meet the *Bruyette* standard. Again, defendants quibble over minor differences between the vandalism perpetrated on plaintiff and that perpetrated on others. Defendants' "signature" was: they refused to deal openly with tenants' attempts to sell their homes to third parties; they refused to approve such sales; they refused any contact with purchasers of the homes; and they surreptitiously vandalized the homes of purchasers who attempted to occupy the homes in order to induce them to leave. Since defendants remained the owners and managers of the home throughout the period covered by the evidence, it was highly likely that the same person who engaged in this conduct in 1986 was the person who vandalized the homes of plaintiff and the other witnesses in 1996 and 1997. The *Bruyette* standard was met.

Much of the evidence was also admissible to prove motive, another ground specifically authorized by Rule 404(b). The classic case of using prior bad act evidence to show motive is *State v. Wheel*, 155 Vt. 587, 587 A.2d 933 (1990), in which the defendant was prosecuted for perjury for lying at an inquest to cover up her submission of false pay vouchers for days in which she did not work as an assistant judge. The court admitted evidence that the defendant did not work on days for which she claimed pay, but altered court records to make it appear she was present. We affirmed on the basis that fear of disclosure of the misconduct in submission of the vouchers was the motive for the perjurious testimony. *Id.* at 604, 587 A.2d at 943-44.

As with other grounds for admission of bad act evidence, it is important that the exception not become a pretext for admission of character evidence. Thus in *State v. Winter*, a rape case, we held that evidence that the defendant committed a rape on another woman was not admissible based on the logic that the defendant's conduct was motivated by sexual gratification in the other rape so he must have had the same motivation for the rape for which he was being tried. 162 Vt. at 394-95, 648 A.2d at 628. We held that this logic was "no more than

an impermissible propensity analysis," *id.* at 395, 648 A.2d at 628, and also rejected it because it admitted "the uncharged misconduct evidence as bearing on an issue not contested." *Id.*

Here, plaintiff was in the position of explaining conduct that appeared bizarre. Without the historical context, and the evidence of defendants' conduct with other tenants, their actions in refusing to return telephone calls, answer letters or cash rent checks from plaintiff were inexplicable. Nor could the jury be expected to understand why defendants might vandalize plaintiff's mobile home. Only by learning defendants' motives could the jury understand why they would engage in the conduct alleged by plaintiff. See *State v. Recor*, 150 Vt. 40, 43-44, 549 A.2d 1382, 1385-86 (1988) (in child sexual assault case, after defense brought out in cross-examination that victim hated defendant, prosecution allowed to show in redirect that hatred was motivated by fact that defendant sexually assaulted victim on an earlier occasion). Admission of the evidence of the *Wright* case, and the experience of other tenants, established defendants' motives without using impermissible propensity analysis.

There is another ground for admitting the prior bad act evidence. Plaintiff sought and obtained punitive damages in this case. The evidence involving the *Wright* case, as well as the evidence of the experience of other tenants, was admissible on whether to award punitive damages and on the amount of any punitive damages. See *Devine v. Rand*, 38 Vt. 621, 626-27 (1866). As the United States Supreme Court explained:

> Certainly, evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law. . . . Our holdings that a recidivist may be punished more severely than a first offender recognize that repeated misconduct is more reprehensible than an individual instance of malfeasance.

*BMW of North America, Inc. v. Gore*, 517 U.S. 559, 576-77 (1996) (citations omitted); see also *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1249-50 (10th Cir. 2000) (in products liability action, plaintiff could show that allegedly defective milling machine had injured others as bearing on punitive damages); *Potter v. Chicago Pneumatic Tool Co.*, 694 A.2d 1319, 1352 (Conn. 1997) (same); *Webster v. Boyett*, 496 S.E.2d 459, 462-63 (Ga. 1998) (in automobile negligence action where

defendant was alleged to be intoxicated, evidence of prior acts of driving while intoxicated is admissible as bearing on punitive damages); *Harris v. Solely*, 756 A.2d 499, 507 (Me. 2000) (in tort action against former landlord for intentional infliction of mental distress, conversion and breach of contract based on landlord failing to maintain premises and sending agents to break into the apartment, "prior misconduct by a defendant that is similar to the misconduct giving rise to liability" is admissible for "the determination of punitive damages"). The *Wright* case evidence was particularly relevant on punitive damages against the trust because it showed that Marcien and Mary Anne Roy were aware that Leon Roy had vandalized homes in the past as part of the scheme to gain ownership of the homes in the park. See *Weeks v. Baker & McKenzie*, 74 Cal. Rptr. 2d 510, 530-31 (Ct. App. 1998) (in sexual harassment case against lawyer and law firm, evidence that lawyer sexually harassed other employees in the past admissible on punitive damages since firm took no action to protect plaintiff).

Finally on this point, defendants argue that even if the prior bad act evidence was admissible under V.R.E. 404(b), it should have been excluded under V.R.E. 403 because its unfair prejudicial effect substantially outweighed its probative value. The trial court has broad discretion in determining whether the unfair prejudicial effect of evidence outweighs its probative value, and the burden of showing abuse of that discretion is a heavy one. See *Ulm v. Ford Motor Co.*, 170 Vt. 281, 290, 750 A.2d 981, 989 (2000).

The court exercised its discretion in this case. It found that the evidence was clearly relevant to show Leon Roy's identity as the person who vandalized plaintiff's home and cut her electric line, defendants' motive in refusing to respond to and deal with plaintiff, and the continuing plan to gain ownership over all homes in the park. It found that the evidence would not have the primary purpose or effect of appealing to the emotions of the jurors and, therefore, was not unduly prejudicial. We add that plaintiff demonstrated a clear need for the evidence in the absence of any witness who saw the vandalism or the cutting of the electric line and could identify the perpetrator. See *Winter*, 162 Vt. at 400, 648 A.2d at 631 (in sexual assault case in which State offered evidence that the defendant assaulted another woman four years earlier, "State's need for the evidence is a major factor in the balancing process"). Because of the court's findings in the *Wright* case, the number of tenants and occupants who had similar experiences, and the continuing increase in the number of homes owned by defendants, the likelihood that the prior bad acts occurred

was strong. See *id.* at 400, 648 A.2d at 632 (a Rule 403 factor is "how definitely the State has proved defendant's commission of the uncharged misconduct"). We agree with the trial court that the probative value of the evidence was high and the risk of unfair prejudice from it was relatively low. Accordingly, we affirm its decision to admit the prior bad act evidence.

## C.

The third claim in support of defendants' request for a new trial is the exclusion of evidence of threats left on defendants' answering machine by plaintiff's ex-boyfriend, who is the father of plaintiff's daughter. The messages, expressed in aggressive and profane terms, threatened to harm "Mr. Roy" for harassing and inflicting stress on plaintiff. The ex-boyfriend lived in South Carolina, and the messages said he would fly to Vermont to carry out his threats.

Without calling the ex-boyfriend to testify, defendants sought to introduce the answering machine tapes in support of their counterclaim that plaintiff intentionally inflicted emotional distress on defendants through her agent, the ex-boyfriend. The court excluded the tapes on the ground that there was no evidence that the ex-boyfriend acted as an agent for plaintiff, and invited defendants' counsel to fill that foundational gap by testimony from plaintiff or the ex-boyfriend. The court also ruled that if the tapes were otherwise admissible, it would exclude them under Rule 403 because their prejudicial effect outweighed their probative value. Defendants' counsel never followed up to fill the foundational gap. With no other evidence to support it, the court dismissed the intentional-infliction-of-emotional-distress counterclaim.

Defendants claim that the court erred in excluding the tapes because the jury could infer that the ex-boyfriend acted as plaintiff's agent from the information he conveyed on the tapes. Although the ex-boyfriend never stated that he was acting for plaintiff, defendants argue that the information about defendants' alleged responsibility for the vandalism of plaintiff's mobile home must have come from plaintiff.

The trial court has broad discretion in determining the adequacy of the foundation for admitting evidence. See *State v. Streich*, 163 Vt. 331, 344, 658 A.2d 38, 47 (1995). As part of its discretion the court can require the foundational showing prior to the admission of the evidence or, alternatively, admit the evidence subject to the later foundational showing. V.R.E. 104(b). The court appropriately chose

the former alternative in view of the abusive, threatening and profane nature of the content of the messages.

The court made a ruling that the evidence was irrelevant absent some showing that the ex-boyfriend was plaintiff's agent. Defendants never attempted to show agency beyond the content of the tape itself and plaintiff's testimony that she talked to the ex-boyfriend because he is her child's father. There was no showing that plaintiff knew of the threats or authorized them in any way. Again, the court had broad discretion in making its evidentiary ruling. See *State v. Hooper*, 151 Vt. 42, 46, 557 A.2d 880, 882 (1988). We think the court acted within that discretion in excluding the answering machine messages.

## III.

### A.

Defendants have raised three issues with respect to damages. First, they argue that the $10,000 compensatory damages award was excessive in light of the fact that plaintiff could itemize damages of only $418 for spoiled food and electrician's services.

The court charged the jury, without objection, that they could award damages for "inconvenience, mental suffering, emotional distress, worry, anxiety, humiliation, and indignity." The evidence was that plaintiff was unable to live in the mobile home for a number of days, first because of the broken windows, and then because of the absence of heat and electricity. She testified that after the cutting of the electric line, she "felt terrified," she was afraid of what would happen next, she had "sleepless nights," and she was "under a lot of stress."

In response to the defendants' motion to set aside the verdict as excessive, the court ruled that the award was within the jury's discretion, especially because of the evidence of emotional distress. We also agree with the court's analysis on this issue.

We recently summarized the law applicable to a challenge to a monetary verdict on the ground it was excessive:

> "In evaluating this claim, we must consider the evidence in the light most favorable to the damages found by the jury and uphold the verdict if there was evidence reasonably supporting it." *Winey v. William E. Dailey, Inc.*, 161 Vt. 129, 144, 636 A.2d 744, 753 (1993) (citation omitted). "To overturn a jury award, an appellant must demonstrate that the verdict was entirely excessive . . . ." *Turgeon v. Schneider*, 150 Vt.

268, 272, 553 A.2d 548, 551 (1988) (internal quotations omitted).

*In re Estate of Peters*, 171 Vt. 381, 393, 765 A.2d 468, 477 (2000). We also noted that we will not interfere with a jury award where exact computation is impossible. *Id.* at 393, 765 A.2d at 477-78 (citing *Imported Car Center, Inc. v. Billings*, 163 Vt. 76, 82, 653 A.2d 765, 770 (1994)).

Defendants' main claim is that the compensatory damages verdict is excessive because it is much higher than the amount awarded in other landlord misconduct cases. See *Human Rights Comm'n v. LaBrie, Inc.*, 164 Vt. 237, 242, 668 A.2d 659, 663 (1995) (challenge to eviction from mobile home park because tenants had children; damages of $1500 for emotional injury and $3000 for loss of civil rights); *Gokey v. Bessette*, 154 Vt. 560, 562-63, 580 A.2d 488, 490-91 (1990) (award of $6600 for violation of warranty of habitability and retaliatory eviction). Obviously, each of the cases must be decided on its own individual facts.

Viewing the evidence here in support of the verdict, we cannot say that the verdict is entirely excessive. The anonymous attacks on the security of plaintiff's home created fear for the safety of herself and her three-year-old child and emotional damage. There is no exact right amount to compensate for this kind of injury.

## B.

Defendants next argue that the court erred in allowing the jury to award punitive damages against the trust. Relying on *Brueckner*, 169 Vt. at 130, 730 A.2d at 1096, the trust argues that plaintiff was required to show that the trustees either directed, participated in or ratified Leon Roy's unlawful acts, but failed to do so as shown by the dismissal of Mary Anne Roy as a party and the jury verdict in favor of Marcien Roy. The language of *Brueckner* is taken from *Shortle v. Central Vermont Public Service Corp.*, 137 Vt. 32, 33, 399 A.2d 517, 518 (1979), and is a truncated version of the alternative elements. The showing the trust asserts is absent is required only if the act on which punitive damages is based is "that of the governing officers of the corporation or one lawfully exercising their authority." *Id.*

The relevant elements necessary for imposition of punitive damages against a master or principal are more fully explained in Restatement (Second) of Torts § 909 (1979). See also Restatement (Second) of Agency § 217C (same). Section 909 sets forth four

alternative elements necessary to impose vicarious liability for punitive damages; the third is that "the agent was employed in a managerial capacity and was acting in the scope of employment." Restatement (Second) of Torts § 909(c). The commentary explains that the purpose of vicarious responsibility in this instance, even in the absence of fault on the part of the employer, is to serve "as a deterrent to the employment of unfit persons for important positions." *Id.* cmt. b. Plaintiff proved the elements of § 909(c), and for the reason stated in the commentary we affirm the court's decision to uphold the award of punitive damages against the trust.

## C.

Finally, defendants argue that the punitive damages award was excessive and in violation of the due process clause of the Fourteenth Amendment to the United States Constitution. They rely on their characterization of Leon Roy's actions as "two minor acts of vandalism" and the ratio between the amount of punitive damages awarded — $100,000 — and the amount of compensatory damages proved, which they assert is $418.

We start with defendants' due process claim. We agree that the critical precedent is *BMW of North America, Inc. v. Gore*, which sets forth guidelines to determine whether a punitive damage award is so excessive as to deny due process. We do not have to get into the decision in depth to decide this issue. The *BMW* factors are the degree of reprehensibility, the ratio between compensatory and punitive awards, and possible sanctions for similar conduct. 517 U.S. at 574-75. All of these factors support the jury's award of punitive damages in this case.

The most important factor is the reprehensibility of defendants' conduct. On this point, defendants minimize Leon Roy's conduct to the point that it is unrecognizable. Looking at the self-help eviction actions in isolation, Leon's actions in smashing all of plaintiff's windows and cutting off her power are marked by violence or a threat of violence and demonstrate an indifference or reckless disregard for the health and safety of others. See *id.* at 576-77. Although the harm he inflicted was primarily emotional and economic, there was a serious threat that the acts would cause physical harm, especially to plaintiff's three-year-old daughter.

The central point of this case, however, is that Leon's actions against plaintiff should not be viewed in isolation. Plaintiff showed that Leon Roy engaged in a pattern of unlawful self-help eviction actions

against residents in the park. She demonstrated that these actions were part of an illegal scheme to gain ownership of all homes in the park at unreasonably low prices. She showed that defendants had been enjoined from such conduct in the past, but it continued. She even showed that smaller amounts of punitive damages had been awarded against defendants, but the awards had not deterred the illegal conduct. We find that defendants' conduct was particularly reprehensible and warranted a large punitive damage award.

To the extent that we need consider the ratio between the compensatory damages award and punitive damages award, we conclude that the ratio of 10 to 1 is reasonable in this case. Indeed, courts have routinely upheld much greater ratios applying the *Gore* standards. See, e.g., *Walston v. Monumental Life Ins. Co.*, 923 P.2d 456, 467-68 (Idaho 1996); *Schaffer v. Edward D. Jones & Co.*, 552 N.W.2d 801, 815-17 (S.D. 1996). In *Harris v. Soley*, 756 A.2d at 509, the Maine Supreme Court recently upheld a punitive damage award sixteen times that of the compensatory award for landlord's "intolerable" conduct toward tenants. The purpose of punitive damages is to deter misconduct, and thus, courts can consider "the possible harm to other victims" that might result if similar behavior is not deterred. *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 460 (1993) (upholding punitive damages award over 400 times greater than the compensatory damage award). Obviously, the jury here faced a strong need to fashion a punitive damage award that would deter defendants' ongoing illegal conduct and scheme and prevent further harm to park residents. In addressing this need, it had compelling evidence that a smaller punitive damage award, levied in 1986, had not deterred the misconduct.

The possible sanctions available for like conduct also weigh in favor of upholding the jury's punitive damages award. Any person who fails to comply with the Act or conditions, restrictions or limitations contained in a permit faces a fine of up to $1000, or imprisonment for up to six months, or both. 10 V.S.A. § 6205(a). The Act authorizes the State to revoke a park owner's permit to operate. *Id.* § 6233(c). Furthermore, it is not inconceivable that defendants' conduct could subject them to other criminal penalties. See, e.g., 13 V.S.A. §§ 3701 (unlawful mischief), 1025 (recklessly endangering another person).

Defendants' argument fares no better under our standards on the reasonableness of punitive damage awards. We overturn a punitive damage award only if it is "manifestly and grossly excessive." *Crump*

*v. P & C Food Markets, Inc.*, 154 Vt. 284, 298, 576 A.2d 441, 450 (1990) (internal quotations omitted). Not only do we defer to the discretion of the jury, see *Powers v. Judd*, 150 Vt. 290, 294, 553 A.2d 139, 141 (1988), we also defer to the judgment of the trial court which heard the evidence. See *Greenmoss Builders, Inc. v. Dun & Bradstreet, Inc.*, 143 Vt. 66, 78, 461 A.2d 414, 420 (1983), *overruled on other grounds by Lent v. Huntoon*, 143 Vt. 539, 549, 470 A.2d 1162, 1170 (1983). Although a jury can award punitive damages only if it has awarded compensatory damages, we have no requirement that there be any particular ratio between the two awards. See *Crump*, 154 Vt. at 298, 576 A.2d at 449.

For the same reasons that the punitive damage award is not unconstitutional, it is also not manifestly and grossly excessive. The amount lies within the discretion of the jury.

## IV.

Defendants raise two counterclaim errors: (1) Marcien and Mary Anne Roy were entitled to judgment for slander as a matter of law; and (2) the court erred in dismissing the ejectment count.

## A.

The first of these issues arises from an amendment to defendants' counterclaims that they attempted to make before the start of the evidence on the first day of trial. The court denied it at that time, but allowed it at the close of the evidence. The motion was made orally, and the amendment was never reduced to writing. In essence, the charge to the jury became the only description of the slander counterclaim. It stated: "Defendants have made a counterclaim that Jodi Sweet falsely accused them in public, of criminal conduct by stating that she believed they were responsible for the acts of vandalism at her mobile home." The claim is based on plaintiff's testimony that she stated to the police, co-workers and others that she thought the Roys were responsible for the vandalism.

The charge to the jury itemized four elements of the tort, including that plaintiff's statements were false and that plaintiff made them "without exercising the care a reasonable person would have in determining whether they were true or false." It reiterated that truth is an absolute defense to slander.

The essence of the claims of Marcien and Mary Anne Roy is that since they were exonerated from direct participation in the self-help eviction, they were entitled to recover even though the jury found that

Leon committed the acts alleged and the court found that the trust, as park owner, was vicariously responsible for them.

A major difficulty with defendants' argument is that they did not show the allegedly defamatory statements with any specificity and never, prior to their post-trial motion, tried to differentiate among the members of the Roy family. Although they raised an issue in the motion, they adopted a different theory from that raised here. They argued that the jury was never instructed to consider the slander claim in light of the fact that it found that Marcien Roy did not personally commit the vandalism and claimed "Marcien Roy is entitled to consideration by the jury of his claim against plaintiff for slander." We assume they did not continue with that theory because they never objected to the jury instructions.

Even if defendants have preserved their claim, we conclude that they have not shown reversible error. If they believed, as they currently argue, that plaintiff's statements were defamatory as a matter of law, they were obligated to obtain a ruling to that effect at the close of the evidence. Instead, the issue was submitted to the jury "because the connotation of the ... spoken words was ambiguous." *Lent v. Huntoon*, 143 Vt. at 547, 470 A.2d at 1168. While defendants proved that plaintiff made statements, they provided only sketchy evidence of the content of the statements. The jury could find that they failed to show that plaintiff made a defamatory statement against Marcien or Mary Anne. They could also find that any statements made by plaintiff were true because the trust was responsible for the actions of Leon Roy. See *Weisburgh v. Mahady*, 147 Vt. 70, 73, 511 A.2d 304, 306 (1986) (statement is not actionable if "substantially accurate"). Finally, they could have found that neither Marcien nor Mary Anne proved any "actual harm." *Wood v. Wood*, 166 Vt. 608, 609, 693 A.2d 673, 674 (1997) (mem.).

## B.

Finally, defendants argue that the court erred in dismissing their counterclaim for ejectment. The court's ruling on this issue is related to that affirmed above holding that plaintiff was entitled to the protection of the Act and could not be evicted by self-help means. In resolving the counterclaim, however, the court went further and ruled that defendants were obligated to allow plaintiff to apply to be a tenant and to consider her application based on the uniform admission standards applicable to any applicant. The court made this ruling in response to Leon Roy's testimony that he would not consider

providing a lease to any person who bought a mobile home in the park without first going through the application process, and to defendants' legal position that anyone who did not apply for admission prior to buying a home in the park was a trespasser, not entitled to the protections of the Act.

We need not get as far into the construction of the Act as the superior court did. We have ruled above that plaintiff was a mobile home park resident, see 10 V.S.A. § 6201(6), and, as such, could not be evicted by self-help. See *id.* § 6237(a)(1). The same section of the Act which prohibits self-help eviction also requires that the park owner, "[p]rior to the commencement of any eviction proceeding," notify the resident "by certified or registered mail" of the grounds for the eviction proceeding or that eviction may be commenced if the resident does not pay overdue rent within twenty days. *Id.* § 6237(a)(2). Defendants never proved they sent such a notice. In fact, Leon Roy testified that he had never sent any written communication to plaintiff. In the absence of such notice, the court correctly ruled that defendants could not evict plaintiff by ejectment.

*Affirmed.*