## Frank A. Ripchick et al v. Lee E. Pearsons et als

[109 A2d 347]

October Term, 1954.

Present: **Sherburne, C. J., Jeffords, Cleary, Adams and Chase, JJ.**

Opinion Filed November 3, 1954.

*Loren R. Pierce* and *Alban J. Parker* for the defendants.

*Miles & Ainsworth* for the plaintiffs.

Sherburne, C. J.   This is an action in tort for trespass for wrongful cutting of timber and seeking treble damages under V. S. 47, §8403, resulting in a directed verdict for the defendant Pearsons and a general verdict against the other two defendants for actual damages and a special verdict answering in the negative a question asking if these two defendants had satisfied the jurors by a fair balance of the evidence that, in cutting such trees as they find were cut on the plaintiff's land, the defendants acted through mistake or had good reason to believe the trees so cut were trees owned by the International Paper Company, and a judgment thereon for treble damages. The cause comes here upon the exceptions of these two defendants to the denials of their motions for directed verdicts and to set the general and special verdicts aside.   When the word "defendants" is hereinafter used it will apply to these two.

This litigation results from a dispute as to the location of the dividing line between two parts of a farm in Andover formerly known as the Gillette farm.   The part claimed to be owned by the plaintiffs is described in Plaintiff's Exhibit 11, a warranty deed from Henry J. Stewart and Christian and Minnie Orgard to Willard H. Jennings and George T. Buffum dated September 22, 1904, as follows:

> "Commencing at a point on the South side of the highway leading from the house of Prof. Marsh to

Weston Island at a point on the South side of said road near a watering trough, thence running Southerly and Westerly on the open mowing land far enough North and West to include all the growing timber East and South of the cultivated land, thence Southerly on the East side of the South mowing land in a straight and direct line to the division line between the Gillette Farm (so called) and the North McDonald farm thence Easterly on the division line between the two said farms to a West line of the Prof. Marsh farm, thence Northerly on the West line of said Marsh farm to the first mentioned road, thence on the South side of said road to the place of beginning, containing about 75 acres be the same more or less.  Meaning by this deed to convey all the land on the East side of said Gillette farm South of said road and East of the South mowing land running a line from the South end of said South mowing in a direct line across the open pasture land to the north line of the North McDonald Farm.  It is especially agreed between the parties herein mentioned as parties to this instrument that the lines around this land shall be established and corners erected during this year.  It being a part of the land conveyed to H. J. Stewart by deed from Addie F. G. Hayden dated June 5, 1903."

The defendant Paper Company claims to own certain timber cutting rights on the other part of the so-called Gillette farm.  This part is described in a warranty deed from Edward Dennette to Fred A. Boynton dated November 30, 1905, as follows:

"Being all and the same premises conveyed to me by Christian Orgard by his deed dated March 30, 1905, and being all of lots 3 and 4 in the 7th range of lots in Andover, excepting that portion thereof conveyed by said Christian Orgard to William A. Jennings and George T. Buffum by deed dated September 24, 1904, and amounting to 75 acres more or less.  The premises hereby conveyed contain about 125 acres."

Our attention has not been further called to the deed from Orgard to Dennette.

Both sides have employed engineers to make surveys and plans to show the respective claims of the parties as to the area and location of the land described in Plaintiffs' Exhibit 11. Any difference between the two surveys as to the exact course of the line in the first call in this exhibit is here immaterial and they agree as to the starting point on the highway and as to the point reached located in a stone wall beside a new wood road that has been bulldozed through it. This point in the stone wall is marked "O" upon plaintiffs' plan, upon which also have been plotted all material parts of defendants' plan. Both surveys agree as to the location of the division line between the Gillette and McDonald farms, which starts in the town line between Weston and Andover at a point marked "D" and runs southeasterly to a point marked "G" on the Marsh line. Both surveys agree as to the Marsh line and the location of the highway. The only dispute is as to the location on the ground of the line from point "O" to the intersection with the division line "D" to "G".

Southerly and a little westerly of the point "O" is a four sided walled-in area of fair size. The northeast corner is marked "P" on plaintiffs' plan, and its southeast corner is marked "T". Between "P" and "T" the stone-wall on the easterly side of this area is straight or nearly so. A straight line running southerly through "P" and "T" will hit the division line between the so-called Gillette and McDonald farms at a point about 30 feet east of the point "D". The plaintiffs claimed that a line running from "O" through "P" and "T" to the point in such division line about 30 feet east of "D" was the rest of their west line, and the parties agree that the amount of the verdict brought in shows that the jury so found. With such a west line Exhibit 11 conveyed about 134 acres. A line drawn from point "T" to represent the shortest distance to such division line marked "D" - "G" would be perpendicular to that line and would intersect it at a point marked "W" 238 feet east of the point marked "D". Plaintiffs' engineer thought that a line running from "O" through "P" and "T" to "W" was the rest of plaintiffs' west

line as described in plaintiffs' Exhibit 11. The defendants claimed that such line was marked by a line drawn from "O" to a point possibly about 300 feet easterly of point "T", marking the southeast corner of the walled-in area, and marked "C1" on plaintiffs' plan, and from there at an angle of 142° 2' to that line drawn southeasterly to intersect the division line "D" - "G" at a point "F" on plaintiffs' plan and 1980 feet easterly from point "D". With such a west line Exhibit 11 conveys 92.28 acres. All the cutting of timber for which recovery is sought was in the area between a line drawn from "T" to a point in the line "D"—"G" about 30 feet east of "D" and the line "C1"—"F". If the line "O"—"C1" were prolonged southerly in a straight line it would hit line "D"—"G" at a point marked "E" on plaintiffs' plan 720 feet easterly of "D" and 1260 feet westerly of "F". Within the area of the triangle "C1"—"E"—"F" 98,000 feet of timber was cut. A line drawn from "C1" to represent the shortest distance to the division line "D"—"G" would be perpendicular to that line and would intersect it at a point marked "V1" 570 feet easterly of "D" and 150 feet westerly of "E". Within the area of the triangle "C1"—"V1"—"E" 25,000 feet of timber was cut.

Relative to the disputed line from point "O" to the division line "D"—"G" we refer to the language of the deed: "thence southerly on the East side of the South mowing land in a straight and direct line to the division line between the Gillette farm (so-called) and the North McDonald farm * * * containing about seventy-five acres be the same more or less. Meaning by this deed to convey all the land on the East side of the said Gillette farm South of said road and East of the South mowing land running a line from the South end of said South mowing in a direct line across the open pasture land to the North line of the North McDonald farm." One of the principal matters in dispute is the location of the South mowing land and the southeast corner thereof. While the defendants claimed that the point "C1" marked the southeast corner of the mowing, we must view the evidence most favorably to the plaintiffs in passing upon defendants' motions. So viewed the evidence fairly and reasonably tended to show that the

walled-in area was the south mowing land referred to in the deed, Plaintiffs' Exhibit 11, that this was relatively smooth mowing land and was the only land south of "O" that could have been mowing land, and that the land easterly of this walled-in land to and past the line "O"—"C1" is very rough and wet and full of large rocks and large hummocks, suggesting that it had always been a pasture.

The defendants argue that because plaintiffs' surveyor stated that the farthest west which the plaintiffs owned was along the line "P"—"T"—"W", and since the jury included the area "T" "D" "W" upon which cutting was done in excess of what the plaintiffs claimed, the verdict cannot be supported on the evidence. Since this claim is not referred to in any of defendants' motions we give it no consideration.

The remainder of defendants' brief on their motions for a directed verdict and to set aside the verdict as applied to the general verdict returned is confined to a claim that since the description of the boundaries in Plaintiffs Exhibit 11 is so indefinite that the area of each of the two parts of the so-called Gillette farm as shown by the deeds and understood by successive owners is of primary importance in determining the division line. The only mention of successive owners after the division called to our attention by the defendants is in the deed from Dennette to Boynton previously referred to. The statement in defendants' brief that "it was not disputed but what the Plaintiff, Ripchick, laid claim only to the 75 acres," is untrue.

■ ■ The intention of the parties, as gathered from the language used when applied to the premises, controls in giving construction to what is conveyed by a deed. *Cummings* v. *Black & Covell*, 65 Vt 76, 25 A 906. In ascertaining such intention, when the particular and general description do not coincide, effect must be given to the particular description, such as expressed by courses and distances, by permanent monuments, by lot and range, and by the adjoining, surrounding lands, under the principle that when the land conveyed is described by clear and well defined metes and bounds, so that the boundaries thereof can be thereby readily determined, such description shall prevail, and settles the boundaries over

any general words of description that may have been used in the deed, tending to enlarge or diminish the boundaries. *Cummings* v. *Black & Covell, supra*; *Spiller* v. *Scribner*, 36 Vt. 245; *Clement* v. *Bank of Rutland*, 61 Vt. 298, 305, 17 A 717, 4 LRA 425; *Huntley* v. *Houghton*, 85 Vt 200, 203, 81 A 452; *Cutler Co.* v. *Barber*, 93 Vt 468, 473, 108 A 400; *McDonough* v. *Hanger*, 94 Vt 195, 198, 111 A 452; *Parrow* v. *Proulx*, 111 Vt 274, 277, 15 A2d 835.

■ When the boundaries designate the land with certainty such boundaries control the quantity although stated incorrectly in the deed. *Wilder* v. *Davenport's Estate*, 58 Vt 642, 646, 5 A 753. Thus, if a man grant to another his meadows in D and S containing ten acres, and they in fact contain twenty, all shall pass. *Beach* v. *Stearns*, 1 Aik. 325, 328.

Laying aside the matter of acreage, the defendants have not questioned that a line drawn from "O" through "P" and "T", if "P"—"T" represents the east side of the south meadow, to a point in the division line "D"—"G" 30 feet easterly of "D" answers the call in Plaintiffs' Exhibit 11 reading, "thence southerly on the East side of the South mowing land in a straight and direct line to the division line between the Gillette farm (so-called) and the North McDonald farm." The only question raised is that the line is indefinite because no monument or marker can be found to show the point where the line hits the division line "D"—"G". As we have seen, the evidence viewed most favorably to the plaintiffs shows that "P"—"T" represents the east side of the south meadow. It follows that because a straight line through "P" and "T" hits the division line between the so-called Gillette and McDonald farm at a certain point that point is almost, if not quite, as sure to mark the corner as if marked by a monument. It is agreed that the jury in arriving at their verdict found that the line from "O" to this point was the boundary of plaintiffs' land. Since no claim or argument has been advanced that the other provisions in Plaintiffs' Exhibit 11 commencing with the word "meaning" alters the meaning of the intent expressed about the line from "O" through "P"—"T" to the division line "D"—"G" that line must be

accepted as the boundary. There being no dispute about the other boundaries the matter of acreage is immaterial.

We now come to the question of treble damages. Error is claimed in the denial of defendants' motion for a directed verdict as regarding such damages, and also to the denial of their motion to set aside the special verdict relative to such damages.

So far as material V. S. 47, §8403 provides:

"If a person cuts down, destroys or carries away * * *timber * * * standing, lying or growing on the land of another person, without leave from the owner of such land * * * the party injured may recover of such person treble damages in an action on this statute. However, if it appears on trial that the defendant acted through mistake, or had good reason to believe that the * * * timber * * * were on his land, the plaintiff shall recover single damages only, with costs."

■ If the defendant would reduce the damages from treble to single, he must show that he acted through a mistake which was not the result of his negligence or misconduct, that is, such a mistake as a careful and prudent man would ordinarily make under like circumstances; or that he had good reason to believe that the timber was on his land, that is, such reason as would lead a man while in the exercise of ordinary care and prudence to thus believe. He cannot recklessly and negligently omit to see and observe those things that would lead him to a right conclusion and to a right action, and then be heard to say that he had an erroneous mental conception that influenced his will and led him to do the act contrary to his intention and wish. *Davis* v. *Cotey*, 70 Vt 120, 121, 39 A 628.

The defendants call our attention to numerous matters in evidence which they claim show that they acted through mistake or had good reason to believe that the timber cut was on the Boynton land, and the plaintiffs call attention to much evidence to the contrary.

The defendants show that on May 25, 1951, the attorney of the defendant, Paper Company, wrote letters to the defen-

dants telling of the purchase by that company of the pulpwood on the Boynton land adjoining the plaintiffs' seventy-acre five lot in Andover, that the line between the Boynton and their lots was not definitely fenced or marked, that it was desirable that it be established by a survey, that the Company was about to make a survey and believed that it should be a joint survey at joint expense, and asking for a prompt reply. There is no evidence of any reply. On June 1, 1951, defendant Glover engaged Fred E. Dwinell, who qualified himself on the witness stand as an experienced surveyor and engineer, to establish the line between the parties. On June 2, Dwinell and Wood, the agent of the defendant Paper Company, called Plaintiff Ripchick from his work at a shop in Springfield in regard to the line and were referred to Charles Merritt, who was acting as agent for the plaintiffs. On June 3, Dwinell, Wood, and defendant Pearsons went to the lot with Merritt for the purpose of trying to ascertain the boundary, but no agreement was reached. In order to determine the line Dwinell consulted the Andover town clerk's records and maps and the original plan of the town and found the size of the lots as laid out as being 105 x 165 rods and meant to contain 108 acres. He corresponded with Mr. Marsh and obtained a copy of his farm plan, and searched the titles of the Marsh farm, of plaintiffs' land and of the Boynton land. He examined an aerial photograph of the area. He talked with Mrs. Boynton and was shown by her her corner. He looked over the growth of timber and found that the area southwesterly of his trial line was probably open pasture with small spruce growing there in 1904. He made use of the photograph before he attempted to locate the point "D" on his plan, and marked "F" on plaintiff's plan. He talked with an old timer, Thomas Powers. He procured all of the above information and as a result located the point "D" on his plan, which point is marked "F" on plaintiffs' plan, before he spotted the line "C"—"D", which is marked "C1"—"F" on plaintiffs' plan, on June 7, 1951. He found the area of his survey to be 92.28 acres.

The defendants sum up as follows: "Upon being made aware that there might be a question about the location of

the boundary between the Plaintiffs' property and the Boynton lot upon which the Defendants proposed to cut, immediate steps were taken to locate such lines through a competent and experienced engineer. This engineer, acting on the best information available and which was derived from many sources, proceeded to lay out what he found to be, from his investigation, the boundary line between the two properties. The Plaintiffs (Defendants probably intended) and each of them acted only upon the results determined by the surveyor and carefully observed the line which he spotted. Since it appears that the Defendants did not act recklessly or negligently and omit to see and observe those things which might lead them to a right conclusion and to a right action, but did, on the other hand, show by undisputed evidence that they had good reason to believe that the trees they cut were trees located on the Boynton lot, prejudicial error appears when the trial court denied the motions of the defendants to direct a verdict for them as to treble damages and when the court refused to grant the Defendants' motion to set aside the verdict thereon."

The plaintiffs' evidence tends to show that they purchased their land in Andover through Charles Merritt, but did not know much about the lines and employed him to look after it. They received the letters previously referred to and took them to Merritt, and the next morning after so receiving them the defendant Pearsons, who had introduced himself as representing the defendant Paper Company, came to Merritt's home and told him to ignore the letters. When Pearsons called on Merritt he had Wood with him and Wood told him he was surveying for the Paper Company. Wood then had knowledge of the contents of Plaintiffs' Exhibit 11. On May 25 the three and Dwinell went upon the land. No cutting had then been done and Merritt told the other two that the plaintiffs claimed to own all within the boundaries that the deed calls for regardless of acreage, that he believed the line went from "T" to "D". He was then asked "Why don't you sell it to us" and he replied that his clients would sell them all the timber on the tract for $12,000 and they could put the line where they wanted to. Merritt requested

them not to cut any more until the line was established and Pearsons informed him that they would not. On an occasion when he was on the lot with Dwinell, Wood, and another, Merritt told the other three that he thought the boundary line was along the lines marked on plaintiffs' plan "O" "P" "T" to "D", that it hit the east side of the south mowing and continued in a straight and direct line to the point "D". Dwinell testified that there was no line on his plan that runs southerly on the east side of the south mowing land in a straight and direct line to the division line between the Gillette farm, so-called, and the north McDonald farm line, because in following the calls in the deed it is necessary in his opinion to take the entire deed as a whole and satisfy as many calls as possible. That one cannot take the description and go around that piece of land as described about the part which says "75 acres" and come out with 75 acres. He therefore chose to ignore that call and put on his plan another call. If he had followed the call in the deed it would have included about 20 acres of the spruce that has been cut. He also ignored the later provision in the deed about a direct line from the south end of the south mowing across the open pasture land to the north line of the north McDonald farm because of the 75 acre provision. So far as the deed was concerned he ran his line because of acreage. He treats the line "B"—"C" on his plan, which is the line "O"—"C1" on plaintiffs' plan as the east side of the south mowing. The defendant Glover cut the timber in question for the Defendant Company. On a Wednesday, which he thinks was about May 20, 1951, Merritt was called on the telephone by defendant Glover who said that he understood that he, Merritt, represented clients that own some spruce near where he was cutting and that there was a dispute over the line to which Merritt replied "That's right." Glover then said "We will cut that spruce and pay you the same as we are paying Mrs. Boynton," and Merritt replied "You will like hell" and Glover said "Oh, a tough guy", and Merritt said "No, I think the line should be straightened out first." Glover then asked if he knew Alban Parker of Springfield, and when Merritt replied "yes" Glover said, "If you don't let us go ahead, we

will hold you for heavy damages, for going to the heavy expense of camps and hutches." Merritt replied that they had not invited them to build any camps or hutches and that they were not interested in what Mrs. Boynton had done. Relative to Dwinell's talk with the old timer, Thomas Powers, previously mentioned, Dwinell testified to in effect telling Merritt that the point "C1" on plaintiffs' plan was shown to him by Thomas Powers as the corner of the south mowing. Merritt previously had testified that Thomas Powers around 1933 offered to show him the lines of the land conveyed by Plaintiffs' Exhibit 11. They went around until they stood at point "O" on plaintiffs' plan, and Powers said "You go straight across this open pasture to the stone wall," referring to a point now marked "P" on the plan, then "You follow along the east side of that south mowing." They walked to the point marked "T" on the plan. Standing at that point he said "you go straight from here to the corner of Peter Peterson's place and the Albee place." Merritt testified that this corner is at point "D". Powers died a few weeks before the trial.

In view of the facts, [1] that defendants' surveyor, Dwinell, chose to disregard the calls in Plaintiffs' Exhibit 11 relative to straight and direct lines in favor of acreage to the knowledge of Wood, the agent and surveyor of the defendant Paper Company; [2] of the dispute as to the location of the south mowing land and that the location claimed by the plaintiffs was walled-in; [3] that Dwinell and Merritt testified to things told them by Thomas Powers in such a way that either Powers gave them contradictory locations of the south mowing or either Dwinell or Merritt gave false testimony; [4] that the spruce growing southwesterly of the line claimed by the defendants had grown between 1904 and 1951 to such size as to be tempting to the defendants; [5] and of the telephone conversation between defendant Glover and Merritt; [6] and of the fair inferences possible to be drawn from all these facts, it cannot be said that the jury failed to act reasonably in answering the special verdict in the negative.

*Error is not made to appear. Judgment affirmed.*