2003 VT 79

# Leita and Roland Pion v. Kevin Bean and Tina Clapper

[833 A.2d 1248]

No. 02-179

Present: Amestoy, C.J., Dooley,* Johnson and Skoglund, JJ., and Gibson, J. (Ret.),
Specially Assigned

Opinion Filed August 29, 2003
Motion for Reargument Denied October 1, 2003

---

* Justice Dooley sat for oral argument but did not participate in this decision.

*Peter F. Langrock* and *Susan M. Murray* of *Langrock Sperry & Wool,* Middlebury, for Plaintiffs-Appellants.

*Michael Rose,* St. Albans, for Defendants-Appellees.

¶ 1. **Skoglund, J.** Plaintiffs Leita and Roland Pion appeal from the trial court's order in this boundary dispute and tort action. Plaintiffs contend that the trial court erred in: (1) establishing the northern boundary of defendants' lot; (2) finding for defendants on their claims of invasion of privacy, infringement of riparian rights, and conversion; and (3) awarding compensatory and punitive damages to defendants. We affirm.

¶ 2. Plaintiffs and defendants own adjoining residential lots in St. Albans, Vermont. Plaintiffs' lot, less than one acre in size, resembles an upside-down "u." It surrounds defendants' one-quarter-acre lot (B/C lot). Both parcels front Vermont Route 36 on the south; the parties dispute the northern, western, and eastern borders of the B/C lot.

¶ 3. In August 2000, plaintiffs filed a complaint to quiet title. They asked the court to establish the boundaries of the B/C lot consistent with a survey they had prepared. They also sued defendants for trespass and unlawful discharge of sewage. Defendants filed counterclaims against plaintiffs, raising allegations of trespass, infringement of riparian rights, intentional infliction of emotional distress, invasion of privacy, and nuisance. Defendants requested injunctive relief, compensatory damages, punitive damages, and attorneys' fees. Defendants later amended their counterclaim to add a claim for removal of trees from their property.

¶ 4. Following a trial by court, in a March 2002 order, the court established the boundaries of the B/C lot consistent with a survey provided by defendants, rejecting the survey submitted by plaintiffs. The court also awarded defendants compensatory and punitive damages on their conversion and invasion of privacy claims, and granted injunctive relief

and compensatory damages on their infringement of riparian rights claim. This appeal followed.

¶ 5. Plaintiffs argue on appeal that the trial court erred in: (1) establishing the northern boundary of the B/C lot; (2) granting injunctive relief, and awarding damages for infringement of riparian rights based on a finding that plaintiffs were responsible for groundwater appearing in defendants' basement; (3) awarding treble damages for conversion of two trees from defendants' property; (4) holding them liable for invasion of privacy; and (5) awarding punitive damages. Given the multiple claims of error raised, we address each issue and its underlying facts in turn.

¶ 6. We first address the parties' boundary dispute. The facts supporting this claim are as follows. The B/C lot was created in 1949 when Mrs. Pion's grandfather subdivided his property. The deed describes a lot bounded by four iron posts, with the following dimensions: eighty-nine feet between the southwest and northwest corner pins, sixty-nine and one-half feet between the northwest and northeast corner pins, sixty feet between the northeast and southeast corner pins, and fifty-nine and one-half feet between the southeast and southwest corner pins. According to the deed, the northwest and northeast corners of the B/C lot are located at ninety-degree angles formed by the intersection of the northern boundary with the western and eastern boundaries.

¶ 7. The original posts marking the northeast and northwest corners of the lot no longer exist, and the parties presented conflicting evidence about the posts' location. Plaintiffs argued that their survey, prepared by Steven Brooks in April 2000, accurately depicted the lot's northeast and northwest corners. At trial, Brooks described the method he used to ascertain the property's northern boundary. He testified that he began his survey at a buried iron marker in the southwest corner of the lot that had been pointed out by Mr. Pion. Following the distance specified in the deed, Brooks then installed a new iron marker eighty-nine feet north of the first marker. At that point, Brooks discovered that he could not "close" the survey using the distances, courses, and specific angles found in the deed. Brooks testified that, if the northern boundary of the property were to meet the western and eastern boundaries at right angles, the distances would be incorrect; if he followed the distances in the deed, the angles would be incorrect. Consequently, following surveying conventions, Brooks let the distances called for in the deed control over the angles, and prepared his survey accordingly.

¶ 8. In support of their claimed northern boundary, defendants submitted a 1995 survey map that had been prepared for the installation of a new septic system (Benchmark survey). The survey map, drawn to scale,

depicts two iron pins in the northwest and northeast corners of the B/C lot. The pins identified on the Benchmark survey are farther north than those depicted in the Brooks survey. Defendants maintained that the pins identified in the Benchmark survey accurately represented the missing northwest and northeast corner pins.

¶ 9. Defendant Bean, and four prior residents of the B/C lot, testified that they had observed the pins in locations consistent with the Benchmark survey map. Bean stated that, when he purchased the B/C lot in 1998, the pins were in the same location as depicted in the Benchmark survey. Bean stated that the northeast corner pin had been located eight feet north and two to three feet east of the northeast corner of his garage.

¶ 10. Previous residents of the B/C property testified similarly. Richard Buro, who lived in the B/C house between 1965 and 1986, testified that the northeast corner pin used to be located six feet north and two feet east of the B/C garage. Douglas Larson, who lived in the B/C house between 1990 and 1994, testified that the northeast corner of the lot had been marked by an iron pin about nine feet north and three feet east of the back of the B/C garage. Deborah Larson testified that the northeast corner pin had been located about three feet east and nine feet north of the B/C garage, and the northwest corner pin had been in a brook behind the B/C house. Ann Putnam, who owned the B/C lot between 1994 and 1997, testified that the northeast corner pin had been located about nine feet north and three feet east of the northeast corner of the B/C garage. She stated that the northwest corner pin had been located in the stream bed, two to three feet west of the north-south property line that had been defined by a stone wall. Mrs. Putnam testified that the Benchmark survey accurately depicted where she perceived the B/C lot boundaries to be.

¶ 11. In 1999, plaintiffs filled in the streambed behind the B/C house, and installed a culvert. Bean, Mrs. Putnam, and other prior residents of the B/C lot testified that the pins they had previously observed were missing when they visited the B/C lot in May 2000.

¶ 12. Based on this and other evidence presented at trial, the court established the B/C lot's boundaries. The court concluded that the iron pins shown in the Benchmark survey were the original artificial monuments installed at the creation of the B/C lot, and that plaintiffs had removed these markers when they filled in the streambed. The court found the Benchmark survey's depiction of the pins' location consistent with testimony from defendants and prior owners of the B/C lot. The court therefore established the northern boundary of the B/C property as

6

a straight line running between the two pins identified in the Benchmark survey.

¶ 13. The court rejected Brooks' opinion regarding the northern boundary because it conflicted with credible circumstantial evidence establishing the original monuments as shown on the Benchmark survey. The court found that Brooks had ignored the monuments, and instead started his survey at a pin pointed out by Mr. Pion. The court also found Brooks unreliable because he changed his testimony mid-trial, and his trial testimony conflicted with his own survey map.

¶ 14. Plaintiffs argue that the trial court erred in relying on defendants' "septic sketch," rather than the Brooks' survey, in establishing the B/C lot's northern boundary. They maintain that the Benchmark survey, and the testimony of Bean and prior B/C owners, was too imprecise to support the court's finding. Plaintiffs also argue that the evidence does not support the court's finding that the pins shown on the Benchmark survey are the original northwest and northeast markers. Plaintiffs make brief reference to the court's determination of the B/C lot's western boundary, but they do not specifically challenge any of the findings underlying the court's conclusion. We therefore decline to address this argument. See *Johnson v. Johnson*, 158 Vt. 160, 164 n.\*, 605 A.2d 857, 859 n.\* (1992) (this Court will not consider arguments not adequately briefed).

■ ¶ 15. The court's determination of a boundary line is a question of fact to be determined on the evidence. *Monet v. Merritt*, 136 Vt. 261, 265, 388 A.2d 366, 368 (1978). We will not disturb the trial court's findings of fact unless they are clearly erroneous, despite inconsistencies or substantial evidence to the contrary. *Id.* When a deed is ambiguous, the court applies well-established rules of construction to establish the intent of the parties to the deed. *Id.* at 264, 388 A.2d at 368. An inconsistent metes and bounds description yields to a description by monument. *Id.*; *Marshall v. Bruce*, 149 Vt. 351, 352, 543 A.2d 263, 264 (1988). Accordingly, distances must be lengthened or shortened and courses varied so as to conform to the monument description. *Monet*, 136 Vt. at 265, 388 A.2d at 368.

■ ¶ 16. In this case, the trial court made extensive findings to support its establishment of the northern property line. The court found that the iron posts referenced in the deed, as monuments, trumped competing interpretations of the deed. Because the original posts were missing, the court relied on the Benchmark survey for the location of the posts, finding it consistent with witness testimony at trial. The court rejected the Brooks survey, after concluding that it conflicted with the Benchmark

survey and Brooks' trial testimony. These findings are not clearly erroneous.

¶ 17. The court acted within its wide discretion in rejecting plaintiffs' survey, and instead relying on evidence presented by defendants in establishing the northern boundary line. "As the trier of fact, it [is] the province of the trial court to determine the credibility of the witnesses and weigh the persuasiveness of the evidence." *Cabot v. Cabot*, 166 Vt. 485, 497, 697 A.2d 644, 652 (1997); see also *Kanaan v. Kanaan*, 163 Vt. 402, 405, 659 A.2d 128, 131 (1995) (trial court's findings accorded wide deference on review because court is in unique position to assess credibility of witnesses and weight of evidence). The trial court rejected Brooks' survey after concluding that he had ignored the monuments described in the B/C deed, changed his testimony mid-trial, and offered trial testimony that conflicted with his own survey map. We will not disturb this assessment on appeal. See *Cabot*, 166 Vt. at 497, 697 A.2d at 652.

¶ 18. In a similar vein, the court acted within its discretion in relying on the Benchmark survey and the testimony presented by defendants. See *id.* The question of whether a map is sufficiently accurate to be helpful to the fact-finder, and therefore admissible, is reserved for the trial court. *Hassam v. Safford Lumber Co.*, 82 Vt. 444, 449, 74 A. 197, 198-99 (1909). Contrary to plaintiffs' assertion, the Benchmark survey map is not a "septic sketch." It is a professional survey, drawn to scale, showing magnetic north, elevations, boundary lines, and the location of two iron pins in the northwest and northeast corners of the B/C lot. It provides a scale of distances, which, when applied, depicts a lot that is approximately eighty-nine feet by sixty-nine feet by sixty feet by fifty-nine feet. The map provides a sufficient basis for establishing the location of the missing northwest and northeast corner pins. Additionally, as the trial court found, and the record reflects, Bean's testimony, and the testimony of four previous B/C lot owners, was consistent with the Benchmark survey's depiction of the iron pins. The court's establishment of the northern property line is therefore supported by the evidence.

¶ 19. Plaintiffs maintain that there is no evidence that the pins identified in the Benchmark survey are the original pins described in the B/C deed. They point to a statement from a previous B/C lot owner that the pins in the streambed might have been installed by a surveyor in the 1960s. This ambiguous statement, standing alone, is insufficient to undermine the court's finding regarding the northern property line. See *Bull v. Pinkham Engineering Assocs.*, 170 Vt. 450, 454, 752 A.2d 26, 30 (2000) (party alleging error must show that there is no credible evidence to support court's findings); *Bevins v. King*, 147 Vt. 203, 206, 514 A.2d

8

1044, 1046 (1986) ("On review, we will make all reasonable inferences in support of the court's judgment."). As discussed above, the B/C deed references four iron posts that mark the corners of the lot. Mrs. Pion testified at trial that the pins were in place when the property was initially conveyed. Bean, and four prior B/C lot owners, testified to the pins' locations prior to their removal by plaintiffs. Other than the single sentence cited above, plaintiffs point to no evidence to support their assertion that the pins depicted on the Benchmark survey were not the original pins referenced in the deed. We therefore conclude that the trial court did not err in finding that these pins were the original pins described in the B/C deed.

¶ 20. Plaintiffs next argue that the trial court erred in holding them responsible for flooding defendants' basement. Plaintiffs assert that the trial court erroneously allowed Bean to testify that plaintiffs' destruction of a streambed behind the B/C home caused the flooding. They maintain that causation should have been established through expert testimony. Plaintiffs also argue that the court's findings, and its conclusion, are not supported by the evidence.

¶ 21. At trial, defendants presented the following evidence to support their claim that plaintiffs had infringed on their riparian rights, and caused their basement to flood. Bean testified that the southeast side of his property was higher than the northwest side, and excess groundwater used to flow down and into the brook where it was carried away. In 1999, plaintiffs filled in the streambed that ran behind the B/C home, and constructed a culvert. Bean stated that, after plaintiffs did this, a substantial amount of water began seeping into the southwest and northeast corners of his basement, damaging property stored there.

¶ 22. Bean also testified that he used a sump pump in his basement to remove excess groundwater from his property. The pump, which was installed in 1973, discharged water through a drainage pipe that emptied into the south side of the streambed, inside the northern boundary of the B/C lot. Prior to plaintiffs' installation of the culvert, the sump pump did not need to run very often; after the culvert was installed, it ran daily. Bean testified, over plaintiffs' objection, that after the installation of the "solid piece of culvert" there was "no place for that water to go" except into his basement. The court rejected plaintiffs' assertion that, as a layperson, Bean was not qualified to make such a statement.

¶ 23. Based on this testimony, the trial court found that, as a result of plaintiffs filling in the streambed and installing a culvert, water that had drained from the B/C property since 1973 no longer had a stream to flow into and be carried away. Consequently, the drainage water backed up

into the basement of the B/C house causing property damage. To prevent future flooding, the court ordered plaintiffs to pay to have the streambed restored to its original condition. The court also awarded defendants compensatory damages for the destruction of their personal property caused by the flooding.

¶ 24. The court's findings, and its conclusion, are supported by the record. As described above, Bean testified that water could no longer drain from his property because plaintiffs had filled in the streambed behind his home. The court did not abuse its discretion in allowing this testimony. See V.R.E. 701 (lay witness may testify to inferences that are rationally based on his perception and helpful to a determination of a fact in issue); *Sweet v. Roy*, 173 Vt. 418, 434, 801 A.2d 694, 706 (2002) (we will not reverse the trial court's discretionary rulings absent an abuse of that discretion). The evidence shows that plaintiffs' elimination of the stream increased the water flow onto defendants' property, causing an increase of water flowing into the basement. This caused damage to defendants' personal property. We therefore conclude that the court properly awarded defendants compensatory damages.

¶ 25. The evidence also supports the court's conclusion that injunctive relief was appropriate. Under Vermont law, "[u]pper and lower property owners have reciprocal rights and duties as to surface water drainage." *Swanson v. Bishop Farm, Inc.*, 140 Vt. 606, 610, 443 A.2d 464, 465 (1982), *overruled on other grounds by Soucy v. Soucy Motors, Inc.*, 143 Vt. 615, 619, 471 A.2d 224, 226 (1983). The upper owner has the right to have the surface water pass to lower lands in its natural condition, and the lower owner must accept the natural flow of such waters upon his land. *Id.* at 610, 443 A.2d at 465-66. Each riparian proprietor has a right to use the water of a stream for his needs in a way that does not deprive others of an equal enjoyment of their same rights. *Lawrie v. Silsby*, 76 Vt. 240, 252, 56 A. 1106, 1108 (1904). The question of what is a reasonable and proper use of the waters of a stream is usually a question of fact for the trier. *Id.* While the record is unclear as to what rights, if any, defendants had to the actual stream at issue, the evidence supports a finding that the stream ran along the northern edge of defendants' land until such time as plaintiffs eliminated the stream by installing a culvert. Prior to its removal, the stream, which was lower than the majority of defendants' ground level, provided a means to drain defendants' property. This evidence provides sufficient support for the court's finding that plaintiffs infringed on defendants' riparian rights. We therefore affirm the court's grant of injunctive relief.

10

¶ 26. Plaintiffs next argue that the court erred in assessing treble damages for conversion under 13 V.S.A. § 3606 based on their removal of two trees from defendants' property. Plaintiffs argue that it was reasonable for them to believe that the trees they cut down were on their property. They also assert that the court erred in calculating damages.

¶ 27. At trial, Bean testified that plaintiffs had removed two shade trees from his property without his permission. Plaintiffs initially maintained that the trees were eighty to ninety percent on their property. They later argued that the trees were completely on their property. Plaintiffs' survey showed the trees straddling the parties' property line.

¶ 28. The trial court determined that, based on the northern property line it established, the two trees were on defendants' property. The court rejected plaintiffs' claim of ownership, finding Brooks' testimony to that effect contradictory and not credible. Even under plaintiffs' own survey, the court pointed out, the trees were straddling the northern property line. The court therefore concluded that plaintiffs had no reason to believe that the trees belonged to them, but instead had removed the trees "solely out of malice." For this reason, it awarded treble damages to defendants.

■ ¶ 29. The court's conclusion is supported by the evidence. Under 13 V.S.A. § 3606, someone who cuts down trees belonging to another must pay treble damages to the rightful owner unless the cutter has "good reason" to believe that the trees belonged to him. See *Amey v. Hall*, 123 Vt. 62, 69, 181 A.2d 69, 74 (1962) (defendant may escape multiple damages if he satisfies court that he had adequate reason to understand that he had title to area where cutting was done); *Ripchick v. Pearsons*, 118 Vt. 311, 318, 109 A.2d 347, 352 (1954) (to escape treble damages, defendant must show that he had good reason to believe timber was on his land, such reason as would lead a man while in the exercise of ordinary care and prudence to so believe). Plaintiffs did not have a good reason to believe that the trees were on their property because, even under their own survey, which was suspect, the trees were straddling the parties' property line. Moreover, because we previously determined that the court properly established the B/C lot's northern boundary, the court's finding that the trees were on defendants' property is sound. See *Town of Wolcott v. Behrend*, 147 Vt. 453, 459, 519 A.2d 1156, 1160 (1986) (location of boundary line between properties, when disputed in an action under 13 V.S.A. § 3606, is question of fact; trial court's finding on this point must stand if supported by any substantial evidence, although there may be inconsistencies, or even substantial evidence to the contrary). We

therefore conclude that the trial court properly awarded treble damages under 13 V.S.A. § 3606.

¶ 30. We reject plaintiffs' assertion that the trial court erred by calculating damages based on the replacement value of the removed trees. Plaintiffs argue that there are only two methods of ascertaining damages under 13 V.S.A. § 3606. However, we have recognized that the elements of damages under 13 V.S.A. § 3606 vary with the kind, condition, location, and use of the damaged trees. *Lavalette v. Noyes*, 124 Vt. 353, 356, 205 A.2d 413, 416 (1964); *Kilby v. Erwin*, 84 Vt. 266, 273, 78 A. 1021, 1023 (1911) (injured party "entitled to a fair compensation for his actual loss"). In this case, the court assessed damages based on Bean's testimony as to the replacement value of the two shade trees plaintiffs cut down. The court was entitled to rely on this testimony in calculating damages. See 12 V.S.A. § 1604 (owner of property competent witness to testify to property's value). We therefore conclude that the court's damages calculation was appropriate.

¶ 31. Finally, we address plaintiffs' claim that the trial court erred in awarding compensatory and punitive damages for invasion of privacy. Plaintiffs maintain that their intrusion of defendants' privacy was not "substantial" enough to warrant a damages award, particularly to the extent the court's conclusion was based on plaintiffs' repeated complaints to police and health inspectors. Plaintiffs also assert that because the alleged harassment occurred "within the public view" it cannot support an invasion of privacy claim. Finally, plaintiffs argue that the trial court improperly relied on testimony from prior owners of the B/C lot in arriving at its conclusion.

¶ 32. Defendants presented evidence at trial that plaintiffs, particularly Mrs. Pion, regularly harassed them. Bean testified that Mrs. Pion called him highly offensive names, threatened to drive him off the property as she had previous owners, and informed him that she would "fence [him] in like the dog that he is." Bean also stated that Mrs. Pion harassed their guests. Ms. Clapper stated that she does not go into the yard because Mrs. Pion verbally harasses her, including telling her that Bean is cheating on her. As a result of Mrs. Pion's behavior, Ms. Clapper is under medical care, and is taking anti-depressant medications.

¶ 33. Bean testified that Mrs. Pion regularly filed false police complaints alleging that defendants were engaging in improper activities, such as fighting or walking around in their underwear. As a result, for a time, the police visited defendants' home two to three times per week. Plaintiffs also complained to health department officials that defendants were discharging sewage onto plaintiffs' property. These complaints were

never substantiated. Over plaintiffs' objections, previous owners of the B/C lot testified to a similar course of harassment.

¶ 34. Based on the evidence, the court concluded that plaintiffs had invaded defendants' privacy, and it awarded defendants compensatory damages for the resulting mental distress they had suffered. The court found that plaintiffs had engaged in a persistent pattern of intrusive conduct that amounted to "hounding." It concluded that plaintiffs had tried to drive defendants from their home by filing false complaints with authorities and "hurling insults and threats." The court explained that, although legitimate complaints to authorities about suspected legal violations should not form the basis of an invasion of privacy claim, repeated false complaints like those made here could support such a claim. In this case, the court explained, plaintiffs' complaints were motivated by their malicious plan to drive defendants from their home. The court found the testimony of prior B/C owners "admissible and relevant evidence" under V.R.E. 404(b) of plaintiffs' motives and their plan to force defendants from their home.

¶ 35. "The right of privacy is the right to be left alone." *Denton v. Chittenden Bank*, 163 Vt. 62, 68-69, 655 A.2d 703, 707 (1994) (internal quotation marks and citation omitted). To establish an invasion of privacy, defendants needed to show that plaintiffs intentionally interfered with their interest in solitude or seclusion in a way that would be highly offensive to a reasonable person. *Id.* at 69, 655 A.2d at 707-08. The intrusion must be substantial. *Id.*

¶ 36. The trial court's conclusion that plaintiffs invaded defendants' privacy is well-supported by the record. As the trial court found, plaintiffs harassed defendants by verbally accosting them and their guests, cutting down their trees, and filling in a streambed behind their home. Ms. Clapper testified that she no longer goes out into her yard because of the harassment, and plaintiffs' actions have caused her mental anguish. Due to plaintiffs' repeated false complaints to the police and health inspectors, the police visited defendants' home two to three times per week. Health inspectors visited defendants' home as well. It is immaterial under *Denton* that most of this harassment occurred in defendants' backyard, rather than inside their home. See *id.* at 68-69, 655 A.2d at 707. The evidence amply shows that plaintiffs intentionally and substantially intruded on defendants' solitude and seclusion. See *id.* at 69, 655 A.2d at 707-08.

¶ 37. Plaintiffs have not demonstrated that the court erroneously relied on the testimony of prior owners of the B/C lot in reaching its

conclusion. Prior B/C lot owners testified that plaintiffs harassed them in an effort to force them to vacate the B/C property. The trial court admitted this testimony because it supported defendants' claim that plaintiffs were similarly trying to drive them off the B/C lot. See V.R.E. 404(b) (evidence of other bad acts admissible to prove motive or plan); see also *Roy*, 173 Vt. at 434, 801 A.2d at 706-07. The court did not abuse its discretion in admitting this testimony. See *Roy*, 173 Vt. at 434, 801 A.2d at 706.

¶ 38. We also reject plaintiffs' assertion that their repeated false complaints to police and health inspectors should not form the basis of an invasion of privacy claim. Unlike the case on which plaintiffs rely, the trial court here found that plaintiffs' complaints were not motivated by genuine public safety or health concerns. See *Beane v. McMullen*, 291 A.2d 37, 46 (Md. 1972) (repeated complaints to zoning officials did not constitute invasion of privacy where complaints resulted in finding of zoning violations). The second case on which plaintiffs rely, *Klipa v. Bd. of Educ. of Anne Arundel County*, 460 A.2d 601 (Md. Ct. Spec. App. 1983), is completely inapposite, and offers no support for their argument. See *id.* at 607-08 (no cause of action for invasion of privacy where school board released student's psychological records to principal of different school where there was no evidence that any unwarranted publicity had been given to the information contained in the records, nor that any person other than those entitled to receive the information had been permitted access). The trial court's finding that plaintiffs' repeated complaints to police and health inspectors were designed to harass defendants is supported by the record, and plaintiffs have not established that the court erred in taking this behavior into account in reaching its conclusion. As noted above, the trial court's findings amply support its conclusion that plaintiffs invaded defendants' privacy.

¶ 39. Plaintiffs' challenge to the court's punitive damages award is equally without merit. Plaintiffs maintain that their conduct was not sufficiently "outrageous" to support a punitive damages award, particularly with respect to Mr. Pion. They argue that the court erroneously relied on testimony from previous B/C lot owners in determining that punitive damages were appropriate. Finally, plaintiffs argue that the court committed reversible error by failing to assess their financial situation in calculating the proper amount of damages.

¶ 40. The trial court awarded defendants punitive damages based on plaintiffs' extraordinarily "vicious disregard and disrespect for the defendants' personal and property rights." The court found Mrs. Pion more culpable than Mr. Pion, but concluded that "they have both acted

14

maliciously in an attempt to drive the defendants out of their home." The court found Mr. Pion liable for $5000 in punitive damages, and Mrs. Pion liable for $25,000.

¶ 41. Punitive damages are appropriate where there has been a showing of actual malice. Schnabel v. Nordic Toyota, Inc., 168 Vt. 354, 362, 721 A.2d 114, 120 (1998). A "showing of 'conduct manifesting personal ill will or carried out under circumstances evidencing insult or oppression, or even by conduct showing a reckless or wanton disregard of one's rights' will suffice." Coty v. Ramsey Assocs., 149 Vt. 451, 464-65, 546 A.2d 196, 205 (1988) (quoting Shortle v. Cent. Vt. Pub. Serv. Corp., 137 Vt. 32, 33, 399 A.2d 517, 518 (1979)).

¶ 42. In this case, the trial court found "overwhelming" evidence that plaintiffs acted with malice. We agree. The record supports the court's assessment of punitive damages against both plaintiffs. We need not recount all of the court's factual findings in this regard; the record is replete with examples of plaintiffs' egregious behavior. For example, the trial court found that Mrs. Pion verbally harassed defendants on a regular basis. The court found that both plaintiffs removed the original northwest and northeast corner pins marking the B/C lot's northern boundary, and also removed the replacement pins that defendants had installed. Plaintiffs put up chain link fences inside the B/C lot property line. During the pendency of this case, both plaintiffs tore down a stone retaining wall on the B/C property line. When ordered by the court to rebuild it, plaintiffs rebuilt it two feet closer to the B/C house. The court's findings support its conclusion that Mr. Pion, as well as Mrs. Pion, should pay punitive damages to defendants.

¶ 43. Plaintiffs next maintain that, even if punitive damages are appropriate, the court's award should be vacated because the court failed to take their financial status into consideration in making its award. They cite Woodhouse v. Woodhouse, 99 Vt. 91, 155, 130 A. 758, 788 (1925), in support.

¶ 44. In evaluating a punitive damages award, we defer to the trial court. Roy, 173 Vt. at 447, 801 A.2d at 715. Punitive damages by their nature cannot be precisely measured, and their assessment is largely within the fact-finder's discretion. Coty, 149 Vt. at 466, 546 A.2d at 206. We will not overturn a punitive damages award unless it is "manifestly and grossly excessive." Id. (internal quotation marks and citation omitted). Although the court can award punitive damages only if it has awarded compensatory damages, we do not require that there be any particular ratio between the two awards. Roy, 173 Vt. at 447, 801 A.2d at

715. We have stated that, in assessing punitive damages, the fact-finder must take into account the character and the standing of the party, the malice or wantonness of the party's conduct, and the party's financial status. *Coty*, 149 Vt. at 467, 546 A.2d at 207 (citing *Woodhouse*, 99 Vt. at 155, 130 A. at 788).

¶ 45. In this case, the court awarded defendants $38,050 in compensatory damages and $30,000 in punitive damages. The trial court did not inquire into plaintiffs' financial status before making its award. However, plaintiffs did not raise this issue below, and they presented no evidence regarding their ability to pay punitive damages. "Contentions not raised or fairly presented to the trial court are not preserved for appeal." *Pinkham Engineering Assocs.*, 170 Vt. at 459, 752 A.2d at 33. Plaintiffs have waived their right to raise this issue for the first time on appeal. *Id.* There is no evidence to indicate that the court's punitive damages award was "manifestly and grossly excessive." *Coty*, 149 Vt. at 466, 546 A.2d at 206. We therefore affirm the court's award.

¶ 46. In light of our conclusions above, we reject plaintiffs' final argument that "justice and fairness" require reversal of the trial court's order.

*Affirmed.*