Filed 03/23/26

VERMONT SUPERIOR COURT

Orleans Unit
247 Main Street
Newport VT 05855
802-334-3305
www.vermontjudiciary.org



CIVIL DIVISION
Case No. 141-6-18 Oscv

| Kent vs. Swift Family Trust et al |
| --- |

### FINDINGS, CONCLUSIONS, AND ORDER

Thousands of years ago, a glacial ice sheet descending from Canada collided with the northern mountains of the Appalachian range near what is now Westmore, Vermont, cutting a deep trough through the rock. When the glacier receded, it left behind a clear, deep lake nestled between two steep peaks. Lake Willoughby, as it is now known, presents "a rare combination of lake and mountain scenery, a lake . . . of exquisite loveliness set amid bold and rugged mountains . . . On either side, at the southern extremity of the lake, like giant guardians, stand Mount Pisgah and Mount Hor, with their Scriptural names, keeping watch over this vision of scenic loveliness."[1]

No doubt because of its striking setting, deep waters, and remote location, the lake has given rise to many myths and legends. Some say it was named for brothers who were among Westmore's first settlers, while others insist the name honors a man who fell through the ice on a horse-drawn sled.[2] The remains of another unlucky winter traveler supposedly emerged the following spring in nearby Crystal Lake, sparking rumors of an underwater tunnel connecting the two bodies of water. Over the centuries, mythical beings like Slipperyskin—a giant super-intelligent man-bear, lake monsters of all shapes and sizes, and even the devil himself have been sighted at the lake.[3]

---

[1] E.C. Jacobs, The Geology of Lake Willoughby, in 12 Report of the State Geologist on the Mineral Industries and Geology of Vermont 280 (1921) (quotation omitted), *available at* https://anrweb.vt.gov/PubDocs/DEC/GEO/StGeoReport/Perkins1920.pdf (last visited Mar. 16, 2026).

[2] Donna Garfield, Willoughby Whispers, The North Star Monthly (Aug. 1, 2024), *available at* https://www.northstarmonthly.com/columns/willoughby-whispers/article_af09edc0-500c-11ef-87b1-07303a675fdd.html (last visited Mar. 16, 2026).

[3] *See, e.g.*, Robert Jones, *Local Legends: Mysterious Lake Willoughby*, Caledonian Record (Jan. 23, 2023), *available at* https://www.caledonianrecord.com/news/local/local-legends-mysterious-lake-willoughby/article_c1dcc296-ae66-5a4e-ad15-3620e376c294.html (last visited Mar. 16, 2026).

Despite these real and imagined dangers, Lake Willoughby has long been a popular summer destination, attracting visitors and seasonal residents from near and far, including the families of the parties here.

This case, which involves a boundary dispute between adjoining properties on the western edge of the lake, came before the court for a bench trial on January 15, 2026. A significant amount of testimony concerned family lore, passed down through the generations, about the boundary line between the properties. But unlike legends of monsters and devils, hearsay statements concerning land boundaries may be admitted as evidence in Vermont. Considering those statements under Vermont Rule of Evidence 804(b)(4)(C), along with the other evidence presented at trial, the court declares the boundaries of plaintiffs' parcel to be as set forth in plaintiffs' Exhibit 8.

### Findings of Fact

The following facts are based on a preponderance of the evidence introduced at the bench trial. The plaintiffs in this case are members of the Kent family and the defendants are members of the Swift family. In the late 1800s or early 1900s, a Swift family ancestor acquired a sizeable portion of lakefront property along the west shore of Willoughby Lake including what was then known as Crescent Beach. The property was later subdivided and several parcels were conveyed by Emerson Swift.

In 1947, Emerson Swift conveyed a parcel to Sherrill Kent. The warranty deed described the boundaries of the parcel in relevant part as:

> Beginning at the midpoint of the present mouth of the brook and Crescent Beach. . . . Thence in a northeasterly direction along the shore of Willoughby Lake for a distance of one hundred feet. Thence inland approximately 33° West of North, a distance of approximately four hundred feet, this line being the continuation of a line passing throug[h] the summit of Mt. Pisgah. Thence in a southwesterly direction approximately 58° West of South, a distance of approximately one hundred ninety feet to the main brook. Thence in a southeasterly direction along said brook to its mouth and the point of beginning.

Pls.' Exh. 3. This description of the property was repeated in a contemporaneous purchase and sale agreement. As the quotation shows, the four corners of the Kent parcel are not fixed with specificity. Moreover, there is no dispute that Emerson Swift, who described the property in the deed and sketched the boundaries in a contemporaneous map, was not a professional surveyor and did not use modern surveying tools.

Nonetheless, the parties agree that the Kent parcel is bounded on the southwest by the brook and on the southeast by the lake. The parties also agree that the location of the mouth of the brook has most likely fluctuated between 1947 and present, but it is impossible to determine to what extent. The Kents have at times throughout the years placed sandbags approximately 100 feet from the cedar tree to prevent the mouth of the

brook from encroaching into their parcel. The parties' dispute in this case concerns the northeast and northwest boundaries, and in particular, the location of the southeast corner of the Kent parcel, which necessarily determines the amount of beach frontage included in the parcel.

The Kents claim that, beginning in at least 1971, Sherrill Kent, now deceased, repeatedly told his son Samuel Kent and his grandchildren that the northeast boundary of the Kent parcel ran from between two boulders on the northeast corner to a cedar tree on the beach on the southeast corner.[4]

Relying largely on this family history, the 1947 deed, and the Emerson Swift map, surveyor Nathan Nadeau—hired by the Kents—discovered an iron pin beneath the roots of the cedar tree on the beach by the lake and sketched a boundary map in 2015 using that pin as the southeast corner of the Kent parcel. He concluded that the northeast boundary of the Kent parcel ran from the pin in the cedar tree (which was approximately 20 feet from the water) in a northwesterly direction for 438 feet to the gap between two boulders, which marked the northwest boundary, and that this boundary line was consistent with the bearings set forth in the deed. Using the bearings in the deed, the Swift map, and other existing monuments on neighboring parcels (in particular boundary pins located on the northeast corner of the adjoining Swift parcel and across Old Cottage Lane on the southeast corner of the Mack parcel), Nadeau located the northwest boundary as running from the boulders to the brook for 235 feet. Nadeau's map is not an official boundary survey, but both Nadeau and licensed surveyor Lawrence Brow testified at trial that the map accurately reflects their conclusion as to the boundaries of the Kent parcel, based on the information they had been provided including the Kent family history described above.

The Swifts dispute the Kents' claim that the northeast boundary runs from the boulders to the ceder tree, and point out that the Kents' proposed boundaries significantly exceed the footage described in the 1947 deed insofar as the Kents' proposed northeast boundary is 438 feet (not counting the additional approximately 20 feet of beach) but was described in the deed as "approximately 400 feet," and that the proposed northwest boundary is 235 feet but was described in the deed as "approximately 190 feet." The Swifts had a survey prepared by TrueLine surveyors in 2022, which plots the boundary lines by starting at the current midpoint of the mouth of the brook on the southwest corner and then measuring the distances and bearings described in the deed as accurately as possible, generally without regard to any existing monuments or historical recollections. The result is that the southeast boundary along the lake (measured from approximately halfway down the beach) is 102.4 feet, the northwest boundary is 400 feet, and the southwest boundary running back to the brook is 190 feet. Thus, under the Swifts' proposed map, the Kent

---

[4] Samuel Kent died while this litigation was pending. His deposition was taken before he died and, by agreement of the parties, was read into the record at the bench trial. *See* V.R.C.P. 32(a)(3)(D).

parcel has approximately ten less feet of beach frontage and significantly less square footage overall on account of the southeast, northeast, and northwest boundaries being shorter than in the Kents' proposal.

Exactly when the boundary dispute between the parties arose is not entirely clear. In the years before he died, Samuel Kent made statements accusing the Swifts of removing boundary markers as far back as 1966, although there is no evidence the parties ever discussed the issue with each other until many years later. Samuel Kent placed a sign on the cedar tree in the 1990s that said "Kent," which was intended to mark the southeast corner of the Kent parcel. Members of the Swift family at some point thereafter placed a metal stake approximately 14 feet farther toward the brook to mark the corner.[5] These actions did not appear to elicit a response from either side at the time they occurred. The parties agree that by 2012 or 2013, they were actively disputing the boundary lines. Based on the evidence presented at trial, the court cannot conclude an active boundary dispute existed before 2012. This case was filed in 2018.

## Conclusions of Law

The Swifts seek to quiet title and have the court declare the boundaries in accordance with the Nadeau map. Conversely, the Kents request the boundaries declared in accordance with the TrueLine survey. The Kents further argue that any testimony regarding hearsay statements by Sherrill Kent should be excluded.

Addressing the last point first, the testimony at trial concerning what Sherrill Kent said about the boundaries of the Kent parcel is hearsay. *See* V.R.E. 801. Under the rule against hearsay, such evidence should be excluded unless an exception to the rule applies. V.R.E. 802. An exception exists under the Vermont Rules of Evidence for statements "as to boundaries of land" if the declarant is unavailable, including because they are dead. V.R.E. 803(a)(4), (b)(4)(C); *see also* V.R.E. 803(20) (permitting hearsay evidence, regardless of declarant availability, concerning "[r]eputation in a community, arising before the controversy, as to boundaries of or customs affecting lands in the community"). This exception is not found in the federal or uniform rules of evidence and is grounded in Vermont common law. V.R.E. 804, Reporter's Notes ("Declarations of deceased individuals concerning boundaries have consistently been admitted in the Vermont cases." (citations omitted)). The court concludes that Sherill Kent's hearsay statements about the boundary of the Kent parcel are admissible under Rule 804(b)(4)(C). Although the plain language of the rule—unlike Rule 803(20)—does not require the statement to have been made before the controversy arose, that requirement is also satisfied here. Although there may have been suspicions of missing monuments dating back to the 1960s or earlier, as noted above,

---

[5] This stake had been removed by the time of the Swifts' 2022 survey and was not relied upon by the Swifts' surveyor to mark the southeast corner.

4

the court does not find that any actual dispute between the parties existed before 2012. Finally, the expert testimony from both sides' experts, in addition to well-established Vermont law, support consideration of family history in drawing boundaries when, as here, the language in the deed is ambiguous. The court accordingly will consider Sherrill Kent's hearsay statements and deny the Swifts' motion to exclude such evidence.

Turning to the merits, "[t]he court's determination of a boundary line is a question of fact to be determined on the evidence." *Pion v. Bean*, 2003 VT 79, ¶ 15, 176 Vt. 1, 6. (citation omitted). "Courts must start with deed language and look to circumstantial evidence about intent only when there is ambiguity." *Brault v. Welch*, 2014 VT 44, ¶ 8, 196 Vt. 459. "A deed term is ambiguous if reasonable people could differ as to its interpretation." *Id.* (quotation omitted). In the case of an ambiguity, "[a]n inconsistent metes and bounds description yields to a description by monument." *Pion*, 2003 VT 79, ¶ 15 ("Accordingly, distances must be lengthened or shortened and courses varied so as to conform to the monument description."). Additionally, "parol evidence of the practical construction given by the parties, by acts of occupancy, recognition of monuments or boundaries, is admissible for the purpose of identifying the land, and in aid of the interpretation of the deed." *Fletcher v. Phelps*, 28 Vt. 257, 261 (1856).

The court concludes the 1947 deed is ambiguous. The deed contains a description of "approximate" metes and bounds, measured from the "midpoint of the present mouth of the brook" and "the shore of Willoughby Lake." No other monuments are described in the deed. The parties agree that the location of the mouth of the brook has fluctuated over time, and that there is no way to determine where it was located in 1947. Thus, while the southeastern and southwestern boundaries are fixed by the brook and the lake, respectively, the northeastern and northwestern boundaries—which can only be determined by measuring from the midpoint of the mouth of the brook in 1947—are ambiguous. *See Fletcher*, 28 Vt. at 261.

The court will accordingly consider extrinsic evidence in determining the northeast and northwest boundaries of the Kent parcel. In particular, the court finds relevant to this determination the map drawn by Emerson Swift, the original grantor; the oral recollection handed down hy Sherrill Kent, the original grantee; the discovery of a boundary pin in the roots of a cedar tree that corresponds with Sherrill Kent's historical description of the southeast corner of the property as located in the ceder tree; and the discovery of boundary pins on the northeast corner of the adjoining Swift parcel—and across Old Cottage Lane on the southeast corner of the Mack parcel. These last boundary pins support Sherrill Kent's historical description of northwest corner of the Kent parcel as running between the two boulders, and are consistent with the Emerson Swift map, which reflects the northwest boundary of the Kent parcel as being part of a continuous boundary line that extends east to delineate the northwest boundary of the adjoining Swift parcel and across Old Cottage Lane to the southeast corner of the Mack parcel.

5

Considering this evidence, as well as the other evidence adduced at trial, the court concludes that the Nadeau map most accurately reflects the intent of the parties to the 1947 deed. Although this map extends the length of the northeast and northwest boundaries somewhat from what is set forth in the deed, the metes and bounds in the deed are, by their own terms, "approximate" and were measured by Emerson Swift, who was not a professional surveyor and whose methods and tools were unknown, but in any event, could not have provided the specificity of modern surveying tools. Considering the other evidence described above, the court concludes that Nadeau map best reflects the intentions of the parties to the 1947 deed and accordingly declares the boundaries of the Kent parcel as set forth in the Nadeau map, which was admitted at trial as plaintiffs' Exhibit 8.

## Order

The court declares the boundaries of the Kent parcel as set forth in the Nadeau map, which was admitted at trial as plaintiffs' Exhibit 8, and quiets any claim of title to the Kent parcel that is inconsistent with that map.

Defendants' motion in limine is DENIED (Motion 10).

Electronically signed on: 3/23/2026 pursuant to V.R.E.F. 9(d)

Benjamin D. Battles
Superior Court Judge

6