Earle v. State, No. S0272-01 CnC  (Norton, J., Dec. 7, 2004)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT                                     SUPERIOR COURT
Chittenden County, ss.:                              Docket No. S0272-01 CnC

EARLE

v.

STATE OF VERMONT

ENTRY

State of Vermont seeks summary judgment on plaintiff Nathan Earle's twelve counts of negligence against the Department of Social and Rehabilitative Services (SRS).  Earle claims that he was sexually abused by N.C., a foster child, that the SRS failed to control or remove from Earle's grandparents' house.  Earle also claims that SRS failed to remove him from his household, despite evidence of physical abuse by his mother.  The State challenges these claims on a variety of theories, including sovereign

immunity and the discretionary function exception.

## Undisputed Facts

For the purpose of summary judgment, the facts are as follows. In 1976, SRS placed N.C. in the home of Earle's grandparents. Prior to his placement, N.C. had no history of sexually abusing others. In December 1980, N.C. sexually molested Earle and his brother. This incident was reported, and SRS confirmed it to the extent that it involved Earle's brother. This abuse had actually begun in 1979 and appears to have involved more than one incident although in 1980 SRS only had evidence of the single incident.[1] SRS enrolled N.C. in counseling and monitored him through periodic visits from a social worker. In April 1982, the Earles told SRS that N.C. had again molested Earle's brother. SRS recommended that N.C. be prosecuted and removed him from the Earle's home in September 1982. There is no evidence that N.C. molested Earle in1982 or that either brother was molested after the April incident. N.C. had no further contact with Earle.

Earle's mother, before, during, and after the incidents with N.C., was working with SRS through another social worker. This assistance was unrelated to N.C. and his placement in the grandparents' household.

---

[1] It is unclear when SRS learned about Earle's molestation. The evidence shows that the brother's molestation was specifically brought to its attention, but as of 1980 SRS was at the very least aware that Earle had probably been molested by N.C. though it is unclear to what extent SRS was aware of the specific acts. From the record, Earle testifies that he knew of three incidents and a fourth that he recently recovered from his memory. The dates of these incidents are unclear, but they appear to have happened between 1979 and 1981.

Earle's mother was under a plan of assistance, based on trouble she was having raising Earle and his brother.  SRS involvement included working with the mother in dealing with depression and stress, support from a social worker, and counseling to stop her overly physical method of dealing with Earle and his brother.  SRS also put Earle and his brother into an "at risk" day care progam and intermittent therapy.  SRS continued to monitor Earle's mother throughout the 1980s.  She and her children continued to participate in some therapy sessions, but her physical abuse continued.  These incidents of abuse vary from a report by the children's care providers that Earle's brother had red marks on his face from where he had been slapped too hard by his mother to Earle's recollections that his mother would smack him on the head with a billy club.

Earle's behavior deteriorated as a result of these traumas, and in the next few years, he showed self-destructive behavior, anti-social tendencies, and problems at school.  When he turned 17, SRS removed Earle from his mother and put him in foster care.  This did not change Earle's depressive and self-destructive behavior, and he spent time at the Brattleboro Retreat to curb his outbursts of  violent behavior directed at his mother and himself.  Earle turned 18 in 1995.  In 1996, his brother filed a complaint against SRS for failing to protect him from N.C.  Earle was not a part of that suit but was aware of it.  Earle has since moved to Maine and enrolled in college.  Since 2000, he has been in therapy where he has recovered several memories of childhood.

## Legal Analysis

Earle has brought 12 claims against the state of Vermont for the combined sexual and physical abuse that N.C. and his mother inflicted on him.  While Earle has not made any distinction as to which claims

correspond to which facts, for present purposes these claims must be analyzed through their unique and respective factual premises.

Earle's claims based on N.C.'s sexual abuse

Earle's claims based on N.C.'s abuse can be divided into before and after SRS's discovery that N.C. had molested Earle's brother. Before SRS had reports of N.C. actually abusing Earle or his brother, Earle claims SRS should have taken precautions to protect him before placing N.C. in his grandparent's household. As there was no official relationship between Earle and SRS at the time, he question of SRS's liability is more properly stated as whether it had a duty to control N.C., and whether it breached that duty by putting N.C. into a household where he would have contact with Earle.[2]

The Vermont Supreme Court has established four factors to determine whether a governmental body has undertaken a duty of care toward specific individuals. Sorge v. State, 171 Vt. 171, 174 (2000). The factors are: (1) whether an ordinance or statute sets forth mandatory acts clearly for the protection of a particular class of persons, rather than the public as a whole; (2) whether the government has actual knowledge of a condition dangerous to those persons; (3) whether there has been reliance by those persons on the government's representations and conduct; and (4) whether failure by the government to use due care would increase the risk of harm beyond its present potential. Id. (citing Sabia v. State, 164 Vt. 293, 299 (1995)).

---

[2] This analysis will set aside, for the moment, any issue of sovereign immunity as raised by the State.

Of these four factors, the Court has emphasized the primary importance of the first factor. See <u>Sorge</u>, 171 Vt. at 175 (discussing <u>Sabia</u>'s reliance on the first factor in determining liability). This is to such an extent that it appears that a failure to find a statutory basis for liability condemns plaintiff's case. See generally <u>id</u>. (affirming summary judgment without further discussion when plaintiffs were unable to demonstrate either a statutory or common law basis for liability under factor one).[3] This is consistent with the general principle of sovereign immunity, which permits claims against the government only to extent that the government has clearly waived its immunity and within the structure of private negligence actions. <u>Denis</u>, 159 Vt. at 484–85.

In regards to this first factor, Earle does not cite any statute that would assign the state a duty of care over him prior to the 1980 discovery of sexual abuse.[4] The only relationship Earle cites to is a "special relationship" that he also argues was created when SRS learned of N.C.'s abuse. Earle's only argument for any duty of care prior to the December 1980 abuse is similar to the plaintiffs in <u>Sorge</u>; SRS owed him a duty of care based on SRS's failure to control N.C. This duty is premised on SRS's custody of N.C. and an exception to the general rule that there is no duty to

[3]Cf. <u>Denis Bail Bonds, Inc. v. State</u>, 159 Vt. 481, 487 (1993) (adopting the four factors as "useful indicia" and noting that the first "goes directly to the heart of plaintiff's argument").

[4]Earle does argue a duty of care from SRS's dealings with his mother, this issue is addressed below and has nothing to do with SRS's placement of N.C. It is unclear from his statement of facts when Earle believes SRS had a duty to control. The court's analysis, in this part, reflects less on Earle's main arguments and more on a desire to analyze his asserted material facts and claims in a coherent and logical manner.

control others.  Restatement (Second) of Torts § 315.  Citing the common law exception, the plaintiffs in <u>Sorge</u> argued that SRS custody created a "special relationship" between the foster child and SRS, which made SRS liable to others for the foster child's actions.  <u>Sorge</u>, 171 Vt. at 176–77.

The Court roundly rejected this theory of liability by noting that SRS custody is not established for the purpose of "control." <u>Id</u>. at 179.  Unlike a private sanatorium where the purpose of the facility was to "control" the individual by "securing him" within its confines, SRS custody is meant to rehabilitate juvenilles and re-institute them to their family and the public. <u>Id</u>.  The public policy adopted by the legislature in its statutes governing SRS custody demonstrated an intent to shift some risk onto the public—that foster children might assault or molest others—in return for the benefit of rehabilitating them and taking measures in their best interest, such as a stable home life with parents rather than institutional care.  <u>Id</u>. at 180.  As the facts of <u>Sorge</u> illustrate, this principle extends to juveniles in SRS custody regardless of their history.  See <u>id</u>. at 173, 180–81 (declining to assign a duty of care despite child's known history of "violent, assaultive, and delinquent behavior").

In this case, the court cannot find a cause of action for negligence based on N.C.'s actions to Earle prior to December 1980.  Like <u>Sorge</u>, there was no prior relationship between SRS and Earle.  The sole relationship between SRS and N.C.[5]  produces no evidence that would illustrate that

---

[5] Unlike the minor in <u>Sorge</u>, N.C. was not in SRS custody for delinquency. This difference, however, does not change the similarities in relationships, which are essentially custodial.  If anything, this difference reflects a lower expectation for SRS in N.C.'s case since the risks and responsibilities of rehabilitative care are not implicated here.

SRS knew or had reason to know that N.C. posed a threat to the general public or to Earle in particular. When it placed N.C. in the grandparents household, SRS was following its statutory mandate. See 33 V.S.A. §§ 305, 3501 n. Permanency Planing. Its continuing legal custody of N.C. did not amount to "control," and therefore did not require SRS to take any further actions.

Moving forward in time to the period following SRS's discovery of sexual abuse, the same Sorge analysis applies to Earle's claims that SRS owed him a duty to control N.C. As Sorge makes clear, the very nature of SRS's custodial relationship precludes a duty of care to others. While the facts of this case raise some questions about the limits of Sorge's balancing when SRS knows one of their children to be a realized threat, they do not suggest behavior so egregious or completely foreseeable that N.C.'s actions might have somehow modified his relationship with SRS and changed its duty to control.

Earle's arguments for SRS liability after December 1980 also emphasize another source of duty, namely one that SRS directly owed to Earle once it was aware of the sexual abuse. Under current statutes, SRS has a duty to a child once a report of sexual abuse is made. 33 V.S.A. § 4915. This duty includes investigating the incident and making a determination of the risks of keeping the child in the household. Id. Thus, Earle argues, SRS owed him a duty to remove N.C. or himself and prevent further abuse.[6]

This argument brings the analysis back to the issue of sovereign

---

[6] Again, it is unclear if Earle suffered any further abuse after December 1980. For the purposes of summary judgment, the court accepts that at least one incident appears to have occurred after December 1980.

immunity. The general rule is that the State of Vermont and its agencies are immune from private actions unless it is waived. Denis, 159 Vt. at 484–85. Under 12 V.S.A. § 5601, the State has waived its immunity for certain tort actions. Id. This waiver, however, depends on the nature of the claim. If the cause of action is an "ordinary common-law tort," such that a private person in the circumstances of the government would be liable, then § 5601 (a) allows plaintiffs to recover. Id. This is know as the "private analog" test. SRS is liable for Earle's injuries only if Earle's cause of action is comparable to a cause of action that he could raise against a private citizen. Id. This test excludes actions that are uniquely government functions and do not have a private analog. LaShay v. Dep't of Soc. & Rehab. Servs., 160 Vt. 60, 69 (1993).

Earle urges this court to analyze SRS's actions and inactions under Sabia v. State, which found that SRS had a duty under 33 V.S.A. §§ 4911, 4915 to protect children after reports of abuse. 164 Vt. 293, 299–304 (1995) (noting that 12 V.S.A. § 519 created a private analog for this duty). There are several problems, however, with a straightforward application of Sabia to the present case.

First, the State correctly notes that §§ 4911 and 4915 were not in effect at the time.[7] While § 4911's antecedent—13 V.S.A. § 1351—is exactly the same, § 4915's does not share the detailed enumerated responsibilities of its successor. That said, the statutes do share two key

---

[7] These statutes were originally adopted as 33 V.S.A. §§ 681,685 and took effect April 25, 1982. 1981, No. 207 (Adj. Sess.), §§ 1, 5. The purpose of the amendments was to create a "successor to and continuation of chapter 27 of title 13 relating to reports of physical abuse of children." Id. at § 4. The relevant text of chapter 27 is available at 1973, No. 237 (Adj. Sess.).

provisions that Sabia found to be important: (1)"[SRS] shall cause an investigation to commence within seventy-two hours after receipt of a report [of child abuse]"; (2) if the investigation produces evidence of abuse or neglect, SRS "shall cause assistance to be provided to the child and his family in accordance with a written plan of treatment." 164 Vt. at 299. For the Court, these two provisions along with § 4915's additional provision—requiring SRS to visit the child's home and interview/observe the child—worked with § 4911's purpose to create a statutory duty that satisfied the first of the four factors which determine whether a governmental body has undertaken a duty of care to specified persons. Id. In this case, notwithstanding the lack of certain detailed responsibilities in § 1355, the statutory duty established by §§ 1351, 1355 are nearly identical and trigger the same duty of care.

Once this duty of care emerges, however, the other three factors become problematic. SRS had knowledge about N.C.'s abuse of Earle's brother as early as December of 1980, but it is not clear when and to what extent it knew of Earle's abuse. Much of Earle's abuse was suppressed and never reported to SRS. Nevertheless, it was not unreasonable for SRS to extrapolate from its knowledge about Earle's brother to consider the danger posed to Earle. Yet, this knowledge does not translate to reliance, the third factor. SRS received one report about Earle's brother in December 1980. In addition to the counseling that N.C. received, SRS also enrolled Earle's brother in "at risk" day care and sent him to therapy. To the extent that SRS made any promises, they were to Earle's brother and his mother. Earle's harm was not reported to SRS at the time. Nor did SRS make promises to Earle and his immediate family, which discouraged them from seeking alternative relief. As to the final factor, the facts are inconclusive. Certainly N.C.'s removal in 1980 would have prevented further harm to Earle and his brother, but it is not clear that this failure to remove was

because of a lack of due care since SRS did take some reasonable measures to prevent further abuse. Notwithstanding these mixed results and the question they raise about how Sabia should be applied in such a situation, there is enough evidence to move forward in the analysis. Cf. Denis, 159 Vt. at 487 (using the four factors as indicia).

The issues of reliance and due care do raise a larger question about SRS activity. This directs the court to the question of whether there is a private analog to Earle's claim of negligence against SRS. In Sabia two sisters reported abuse by their stepfather at different times, through different, credible sources. 164 Vt. at 297. SRS took both reports and did nothing. As a result, the sisters endured 4 years of continuing sexual and physical abuse at the hands of their step-father. Id. When the sisters brought suit, their claim was not that SRS's actions had been ineffective or that SRS should have removed them from their step-father; their claims was a more basic claim of relief founded upon SRS's total failure to do anything. Id. at 301 ("[P]laintiffs' actual complaint is that SRS failed to provide any assistance whatsoever, despite its statutory duty to do so.").

In contrast, SRS did act in the present case. It enrolled N.C. in counseling; it monitored N.C. through a social worker; it enrolled Earle's brother, and later Earle, in "at risk" day care and therapy; and it worked with Earle's grandparents to deal with N.C. Therefore, Earle's claim is necessarily a more narrow claim that SRS failed to remove N.C. or Earle from their respective households. This is Earle's true claim because the larger duty to take steps to protect or "cause assistance to be provided" were factually met on some level. Earle's argument is that these actions were not enough; that as long as N.C. lived with his grandparents, or Earle lived close by, Earle was at risk of further abuse and SRS was not protecting him. To the extent that this is Earle's claim, it cannot stand

because it lacks an analogous private action.  Removing children from households is a uniquely government function, and there is no private equivalent. LaShay, 160 Vt. at 69; see also  Sabia, 164 Vt. at 301 (broader interpretation of private analog appropriate only where state failed to do anything).

Earle's remaining claims concerning N.C. are base on the negligence surrounding SRS's actions to prevent further harm.[8]  According to Earle, SRS should have recognized through their counseling and monitoring of N.C. that he was a continuing threat and that the initial incident of sexual abuse was a harbinger not an aberration.  This argument faults SRS's choices and urges the court to allow a jury to find negligence.  This argument is impermissible under 12 V.S.A. § 5601(e)(1), which bars claims attacking the discretionary functions of an agency.  This exception to tort liability, known as the "Discretionary Function Exception," was created to prevent courts from invading the province of other branches of government and passing judgment on legislative or administrative policy through tort law.  Sabia, 164 Vt. at 307.  While the exception does not apply to actions that the State must take—doing something after a child abuse report—it does protect judgments or choices that agencies make—what they chose to do.  Searles v. Agency of Transportation, 171 Vt. 563, 563 (2000) (mem.).  If the action involves an "element of judgment or choice," then the court must determine "whether that judgment is of the kind that the discretionary function exception was designed to shield."  Id. (quoting United States v. Gaubert, 499 U.S. 315, 322–23 (1991)).

---

[8] This also includes any claim that N.C. should have been removed from the grandparents' home to the extent that such a claim would survive under LaShay or Sabia.

In this case, SRS was faced with a report of child abuse. Under the existing statute, 13 V.S.A. § 1355, it had a duty to investigate and render any assistance it deemed necessary. Earle cites to no statutory standard or rule that dictates how SRS must access a child's need or what assistance must be rendered in each case. Instead, he offers competing analyses that dispute SRS's assessments and decisions as well as offering reasons why SRS should have acted differently. This evidence does not disprove the judgmental nature of SRS's decisions. If anything, it demonstrates the subjective nature of SRS's role and the alternative considerations that agency might have used to make its determination.

This is precisely what the exception was designed to avoid. This court has no business second-guessing and re-hashing SRS decisions and assessments conducted 22 years ago. The policy considerations that SRS used in its decision to seek therapy for N.C. rather than removing him, may in retrospect have been flawed and led to further harm, but there is no evidence that SRS failed to assess the problem or seek some relief to prevent N.C. from repeating his crimes and harming Earle or his brother. Given that such decisions lie beyond the scope of this court's tort review, plaintiff's claim against SRS for negligence concerning the placement of N.C. are dismissed.

<u>Earle's claims for relief for his mother's physical abuse</u>

Earle's remaining claims against SRS concern their failure to prevent physical abuse by his mother. From the evidence, Earle's claims satisfy the initial problems of sovereign immunity in that they appear to trigger the same duty of care that N.C.'s abuse trigger through 33 V.S.A. § 4915. But once more Earle's claims raise the twin issues of private analog and discretionary function exception.

From roughly 1978 until Earle's removal in 1994, SRS worked with Earle's mother through a plan of assistance to develop her parenting skills and prevent her abusive outbursts. As with N.C., SRS monitored the family through a social worker and provided intermittent therapy to Earle's mother as well as Earle to help them deal with various issues. Earle's claim in this respect is not that SRS failed to act, but that its failure to remove him from his mother earlier proximately caused him to suffer further injuries at her hands.[9] Again, the problem is not that SRS did not act, as a private actor could, to provide relief or some assistance, but rather that it did not provide enough and did not remove him from his home soon enough. Under the test, there simply is no analogous private right of action to SRS's negligent failure to remove Earle from his home sooner. LaShay, 160 Vt. at 69.

This leaves the claims that SRS should have responded more aggressively, which falls under the discretionary function exception. As with N.C., SRS's actions toward Earle and his mother reflect discretionary judgments wrought with policy considerations—such as the child's safety and the preservation of the home. It would be improper for tort law to invade this discretionary area and subject what are SRS judgments made over time to the Monday morning objectivity of tort law. For this reason, Earle's remaining claims for summary judgment based on his mother's abuse are denied.

---

[9] It is also unclear what kind of physical injuries Earle suffered through his mother. Earle has presented evidence that he has recovered memories of beatings and being hit with a billy club, but he did not present any evidence, aside from cumulative psychological damage, of their severity or frequency. It is also unclear from Earle's evidence how much SRS was aware of these incidents.

# Motion for Default

Finally, Earle seeks default judgment and sanctions against the state for not filing a second amended answer to his second amended complaint. This defect has been at least partially cured by the state's filing of a second amended answer. The question is whether this answer is permissible under V.R.C.P. 15. Earle argues that the answer should be disallowed because Rule 15(a) only gives a party 10 days to plead in response to an amended pleading. The state argues that the Rule 15(a) clock has not begun because Earle has not "served" the second amended pleading since receiving leave to do so from the court. This contention would seem to be disputed by the Vermont Supreme Court's analysis of a similar situation in Sweet v. Roy. 173 Vt. 418, 429–30 (2002). In that case, the Court rejected an appeal based on a party's failure to separately serve an amended complaint after receiving leave to amend it where the motion to amend contained the amended pages of the complaint. Id. The Court rejected this argument as "a technical rule that elevates form over substance." Id. at 430.

At the same time, Earle's argument rings hollow within the context of the situation at hand. Regardless of the nature of Earle's motion, the State is essentially seeking to amend its pleadings to conform to Earle's new factual allegations and claims. The Rules of Civil Procedure and the common law encourage liberality in this area where there is no prejudice to the other party. Bevins v. King, 143 Vt. 252, 254–55 (1983) ("When there is no prejudice to the objecting party, and when the proposed amendment is not obviously frivolous nor made as a dilatory maneuver in bad faith, it is an abuse of discretion to deny the motion."). Earle has made no showing of prejudice and has only argued for a technical application of Rule 15(a)'s deadlines. Indeed, the State's opposition should come as no surprise to Earle considering its previous, vigorous response to his earlier claims.

From the record it appears that the parties have conducted discovery and filed motions consistent with a trial on the merits of the old as well as the new claims.  Furthermore, these new facts do not substantively raise new claims as they are extensions of his prior two complaints.  As both parties have been actively litigating these claims and have prepared to bring them to trial, granting a default judgment on these facts, now, would avoid the substantive legal arguments raised by both sides, and rob the court of the opportunity to adjudicate these claims on the merits.  V.R.C.P. 1.  In other words, it would be a technical victory over substantive law.

Rule 15(a) allows a party to respond to an amended pleading either 10 days after service of the amended pleading; within the time remaining to respond [under Rule 12]; or as the court otherwise orders.  In this case, the court will allow the State's second amended answer to be entered and deny Earle's motion for default.

Based on the foregoing, defendant State of Vermont's motion for judgment is granted.  Plaintiff's motion for default judgment and sanctions is denied.

Dated at Burlington, Vermont_____, 2004.